UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
CITY OF OMAHA, NEBRASKA CIVILIAN
EMPLOYEES' RETIREMENT SYSTEM and
CITY OF OMAHA POLICE AND FIRE
RETIREMENT SYSTEM, Individually and on
Behalf of All Others Similarly Situated,

                Plaintiffs,

      -against-

CBS CORPORATION, SUMNER REDSTONE,
LESLIE MOONVES, FREDERIC G.
REYNOLDS and SUSAN C. GORDON,

                Defendants.
----------------------------------------------------------x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3-/6-/0

08 Civ. 10816 (PKC)

MEMORANDUM
AND ORDER

P. KEVIN CASTEL, District Judge:

        Plaintiffs allege in an Amended Class Action Complaint (the

"Complaint") that defendants violated the federal securities laws by failing to take a

timely impairment charge to the goodwill of defendant CBS Corporation ("CBS," or "the

Company"). Plaintiffs the City of Omaha, Nebraska Civilian Employees' Retirement

System and the City of Omaha Police and Fire Retirement System assert claims on behalf

of all persons who purchased CBS common stock between February 26, 2008 and

October 10, 2008.[1]  (Compl. ¶ 1.) They allege that all defendants violated section 10(b)

of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78j(b), and SEC

Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. The Complaint also asserts

---

[1] The Clerk is directed to amend the caption in this case to reflect that the City of Pontiac General
Employees' Retirement System has withdrawn as lead plaintiff (Docket # 28) and that the City of Omaha,
Nebraska Civilian Employees' Retirement System and the City of Omaha Police and Fire Retirement
System are the lead plaintiffs.

a claim of control-person liability under section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a),
against defendants Sumner Redstone, Leslie Moonves, Frederic G. Reynolds and Susan
C. Gordon (the "Individual Defendants").

Defendants move to dismiss all claims pursuant to Rules 12(b)(6) and
9(b), Fed. R. Civ. P., and the Private Securities Litigation Reform Act of 1995, 15 U.S.C.
§ 78u-4 (the "PSLRA"). For the reasons explained below, I conclude that the plaintiffs
have failed to allege that the defendants committed acts of securities fraud. The claims
under section 10(b), Rule 10b-5 and section 20(a) are dismissed. Plaintiff may file a
motion seeking leave to replead.

## BACKGROUND

### 1.  Overview of the Company and the Purpose of the Defendants' Allegedly Fraudulent Scheme.

CBS is a media company with operations in the United States and
internationally. (Compl. ¶ 22.) It is comprised of four major business units: television,
radio, outdoor and publishing. (Compl. ¶ 34.) CBS Television includes a national
broadcasting network, cable channels and Company-owned television stations. (Compl.
¶ 34.) CBS Radio owns and operates 140 radio stations in the United States. (Compl.
¶ 34.) CBS Outdoor is in the business of outdoor display advertising, such as billboards
and stadium signage, and CBS Publishing publishes and distributes consumer books.
(Compl. ¶ 34.) CBS's common stock, including both voting and non-voting shares, is
listed on the New York Stock Exchange. (Compl. ¶¶ 22, 30.)

According to the Complaint, the defendants violated the federal securities
laws by not taking an impairment charge to goodwill value in the first quarter of 2008.

When CBS later took an impairment charge in October 2008, plaintiffs assert, it was timed for the personal benefit of the Company's chairman, defendant Sumner Redstone. (Compl. ¶ 2.) To understand the plaintiffs' theory as to the alleged purpose of this scheme, it is necessary to review the allegations as to Redstone's holdings. Redstone owned 80 percent of the shares of National Amusements, Inc. ("National Amusements"). (Compl. ¶ 3.) Redstone chaired the boards of both CBS and a related entity, Viacom, Inc. (Compl. ¶ 3.) National Amusements, in turn, owned approximately 80 percent of voting shares for both CBS and Viacom. (Compl. ¶ 3.) According to the Complaint, Redstone, via his ownership of National Amusements shares, exercised significant control over CBS. As phrased in the Complaint, Redstone "called the shots." (Compl. ¶ 4.)

Before the class period commenced, Redstone, "acting on behalf of his alter-ego National Amusements, borrowed a total of $1.6 billion from various lenders." (Compl. ¶ 5.) The loan required "significant principal payments" if the value of CBS or Viacom stock fell below a predetermined level set forth in covenants to the loan. (Compl. ¶ 5.) The existence of the loan and its covenants was not disclosed until on or about the end of the Class Period. (Compl. ¶ 5.) Plaintiffs contend that the defendants artificially inflated CBS's goodwill value in order to help Redstone avoid principal payments on the National Amusements loan. (Compl. ¶¶ 6, 11.)

Central to defendants' scheme to inflate the Company's share prices, the Complaint asserts, was CBS's failure to take a timely impairment charge to its goodwill value. (Compl. ¶ 6.) According to the plaintiffs, CBS's later writedown of goodwill followed a "general market collapse" that already drove the stock price of CBS and Viacom below the levels specified in the $1.6 billion loan, requiring Redstone to sell

CBS shares held by National Amusements in order to pay creditors. (Compl. ¶ 13.) According to the Complaint, in light of CBS's fallen stock price, the defendants no longer had a basis to maintain an inflated price for Redstone's benefit, and therefore undertook impairment testing for the Company's goodwill value. (Compl. ¶ 13.)

### 2. Allegedly False and Misleading Statements Made During the Class Period.

Plaintiffs allege that by not taking an earlier impairment charge to goodwill, defendants made false and misleading statements as to the true nature of CBS's financial health. According to the Complaint, defendants' false and misleading statements began on the first day of the class period: February 26, 2008. (Compl. ¶ 35.) On that date, CBS issued a press release announcing the results of the fourth quarter of 2007. (Compl. ¶ 35.) It reported positive income for the Company, and in subsequent public statements, defendant Leslie Moonves, the CEO and president of CBS, expressed enthusiasm for the Company's future growth potential. (Compl. ¶¶ 23(b), 35-37.) Defendant Frederic G. Reynolds, the Company's executive vice president and CFO, stated that CBS had "a very strong balance sheet" that would help increase the Company's "profit growth going forward and to return cash to shareholders." (Compl. ¶¶ 23(c), 38.) In the Company's annual Form 10-K filed with the Securities and Exchange Commission ("SEC") on February 28, 2008, CBS reported a goodwill value of $18.452 billion and total assets of $40.43 billion. (Compl. ¶ 39.)

The Company's next reported results also were positive. On April 29, 2008, CBS issued a press release announcing the financial results of the first quarter of 2008, which included a fourteen percent increase in net earnings, a twenty-five percent increase in free cash flow, and a boost in quarterly dividends. (Compl. ¶ 43.) Moonves

and Reynolds touted the quarterly results in conference calls and in a press release. (Compl. ¶¶ 44-46.) Moonves said in a conference call that the Company would "run [its] business effectively regardless of the economic climate," and predicted that advertisers would continue to be drawn to CBS. (Compl. ¶ 45.) In the Company's Form 10-Q filing for the first quarter of 2008, it reported a goodwill value of $18.481 billion – a $29 million, or 0.157 %, increase from its 10-K filed the prior February. (Compl. ¶ 47.)

On July 31, 2008, CBS announced results for the second quarter of 2008, including one percent increases in revenue and net earnings, and a further increase in the Company's free cash flow. (Compl. ¶ 50.) In a conference call, Moonves stated that he was "proud" that the Company had dealt with "the current environment" and that it continued to have "very healthy levels of cash. ... Yes, the economy is tough right now. But we are managing our businesses effectively, focusing on improving both efficiency and growth. And as soon as the marketplace improves, we are going to be ready and in a position that capitalizes on the upturn." (Compl. ¶ 52.) Reynolds observed that "the U.S. economy has slowed since the first quarter," affecting the Company's local businesses, and stated that the Company was looking to lower its operating costs. (Compl. ¶ 53.) In its Form 10-Q filing for the second quarter of 2008, the Company reported goodwill value of $20.134 billion – an increase of more than $1.6 billion, or approximately 8.9 % growth over the previous quarter. (Compl. ¶ 54.)

3.   The Company's Impairment Charge to Corporate Goodwill.

On October 10, 2008 – the final day of the class period – CBS announced in a press release that it had undergone impairment testing and would likely incur an impairment charge to goodwill value. (Compl. ¶ 57.) In its press release announcing

likely impairment to goodwill, CBS stated the following:

> The continued economic slowdown in the United States has adversely
> affected advertising revenues across the Company's businesses, primarily
> at the local level and the effects of the current financial crisis are likely to
> cause further declines in advertising spending. As a result of these market
> conditions, the Company is revising its 2008 full year business outlook
> . . . to a decline of mid-teens versus 2007.
>
> . . .
>
> In addition, as a result of these recent adverse market conditions, the
> Company is currently performing an interim impairment test on its
> existing goodwill, other indefinite lived intangible asset balances and
> investments. Based on preliminary results, the Company expects to incur
> a non-cash impairment charge of approximately $14 Billion, in the third
> quarter of 2008 to reduce the carrying value of goodwill intangible assets
> related to FCC licenses and investments.

(Compl. ¶ 57.) CBS's stock price subsequently declined from $10.14 per share to $8.10

per share. (Compl. ¶ 58.) In its Form 10-Q filed on November 4, 2008, CBS stated that

it would take a one-time, non-cash impairment charge to goodwill in the amount of

$10.99 billion, thereby reducing goodwill to approximately $9.1 billion. (Compl. ¶ 78;

Danilow Dec. Ex. 2.) In an earnings call at the end of the third quarter of 2008, Moonves

stated that CBS had "anticipated the slowdown for some time . . . going back to last

year." (Compl. ¶ 87.) According to plaintiffs, "CBS was required to take impairment

charges; however it was required to take such charges in steps beginning no later than the

first quarter of 2008 and probably sooner." (Compl. ¶ 87.)

    According to the Complaint, CBS's statements during the class period

materially misled investors as to the Company's actual value and artificially inflated

share prices. (Compl. ¶¶ 61-63.) Plaintiffs contend that the Company violated Generally

Accepted Accounting Principles ("GAAP") by not taking an impairment charge to

goodwill in the first quarter of 2008, and in so doing "knowingly or recklessly employed

improper accounting practices which falsely inflated the Company's income and assets

during the Class Period." (Compl. ¶ 64.) Issued pursuant to GAAP, the Financial

Accounting Standards Board's Statement of Financial Accounting Standards No. 142,

titled Goodwill and Other Intangible Assets ("SFAS 142," attached at Danilow Dec. Ex.

3), provides that the value of goodwill should be tested for impairment at least annually,

and "more frequently if events and circumstances indicate that the assets might be

impaired." (Compl. ¶ 68.) CBS's Form 10-K filing for 2007 stated in part:

> Intangible assets with indefinite lives, which consist primarily of FCC
> licenses and goodwill . . . are tested for impairment on an annual basis and
> between annual tests if events occur or circumstances change that would
> more likely than not reduce the fair value below its carrying amount. If
> the carrying value of goodwill or the intangible asset exceeds its fair
> value, an impairment loss is recognized as a non-cash charge.

(Compl. ¶ 69.)

Plaintiffs contend that book value in excess of the Company's market

capitalization should have alerted CBS that an impairment test was necessary; its

allegations note that the gap between the two figures steadily widened over the course of

2008. (Compl. ¶ 77.) In announcing the likely impairment charge on October 10, 2008,

CBS cited "recent adverse market conditions," but plaintiffs contend that CBS's 2008

public filings reflect no "recent" developments that should have triggered an impairment

test. (Compl. ¶ 81.) "In truth," the Complaint alleges, "as detailed above, the real reason

CBS did not take the impairment to intangible assets until October 10, 2008 was so

Defendant Redstone's company, National Amusements, could avoid making payments

under the Principal Payment Covenant." (Compl. ¶ 85.) Plaintiffs also allege that the

Individual Defendants engaged in sales of CBS stock during the Class Period, earning net

proceeds of nearly $127 million, $122 million of which were attributable to defendant

Redstone. (Compl. ¶¶ 88-90.)

## STANDARD ON A MOTION TO DISMISS

Pursuant to Rule 12(b)(6), Fed. R. Civ. P., "[t]o survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009) (quoting Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

Along with the standards of Rule 12(b)(6), the PSLRA has "imposed heightened pleading requirements and a loss causation requirement upon 'any private action' arising from the Securities Exchange Act." Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 165 (2008) (quoting 15 U.S.C. § 78u-4(b)). The PSLRA requires a complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). "Any complaint alleging securities fraud must satisfy the heightened pleading requirements of the PSLRA and Fed. R. Civ. P. 9(b) by stating with particularity the circumstances constituting fraud." ECA, Local 134, 553 F.3d at 196 (citing Tellabs Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)). This pleading threshold gives a defendant notice of the plaintiff's claim, safeguards a defendant's reputation from "improvident"

charges and protects against strike suits.  See ATSI Commc'ns, Inc. v. Shaar Funds, 493

F.3d 87, 99 (2d Cir. 2007).  "A securities fraud complaint based on misstatements must

(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the

speaker, (3) state where and when the statements were made, and (4) explain why the

statements were fraudulent."  Id. at 99 (citing Novak v. Kasaks, 216 F.3d 300, 306 (2d

Cir. 2000)).

As the Second Circuit has repeatedly required, plaintiffs "must do more

than say that the statements . . . were false and misleading; they must demonstrate with

specificity why and how that is so."  Rombach v. Chang, 355 F.3d 164, 172, 174 (2d Cir.

2004); accord ATSI, 493 F.3d at 99 ("A securities fraud complaint based on

misstatements must . . . explain why the statements were fraudulent.  Allegations that are

conclusory or unsupported by factual assertions are insufficient.") (citations omitted).

Rule 9(b), Fed. R. Civ. P., for its part, requires a party to "state with

particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge,

and other conditions of a person's mind may be alleged generally."  Allegations of fraud

may be "too speculative even on a motion to dismiss," particularly when premised on

"'distorted inferences and speculations.'"  ATSI, 493 F.3d at 104 (quoting Segal v.

Gordon, 467 F.2d 602, 606, 608 (2d Cir. 1972)).  "The [PSLRA] insists that securities

fraud complaints 'specify' each misleading statement; that they set forth the facts 'on

which [a] belief' that a statement is misleading was 'formed'; and that they 'state with

particularity facts giving rise to a strong inference that the defendant acted with the

required state of mind.'"  Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 345 (2005)

(quoting 15 U.S.C. § 78u-4(b)(1), (2)).

The PSLRA also "requires plaintiffs to state with particularity . . . the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'" Tellabs, 551 U.S. at 313 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 & n.12 (1976)). To qualify as "strong," the "inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id. at 314.

## DISCUSSION

I.      The Complaint Fails to Allege that the Timing of CBS's Impairment Charge Amounts to Securities Fraud.

A.    Background on Section 10(b) and Rule 10b-5.

Section 10(b) of the 1934 Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ." 15 U.S.C. § 78j(b). "The SEC rule implementing the statute, Rule 10b-5, prohibits 'mak[ing] any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in light of the circumstance under which they were made, not misleading.'" ECA, Local 134, 553 F.3d at 197 (alterations in original) (quoting Rule 10b-5).

As Judge Cote has observed, "[s]ection 10(b) of the Exchange Act is designed to protect investors by serving as a 'catchall provision' which creates a cause of action for manipulative practices by defendants acting in bad faith." In re Openwave Sys. Sec. Litig., 528 F. Supp. 2d 236, 249 (S.D.N.Y. 2007) (citing Ernst & Ernst, 425 U.S. at 206). An action brought under section 10(b) ultimately requires a plaintiff to prove (1) a

material misrepresentation or omission; (2) scienter; (3) a connection between the

misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

misrepresentation or omission; (5) economic loss; and (6) loss causation. Stoneridge, 552

U.S. at 157 (citing Dura, 544 U.S. at 341-42).

The securities laws do not provide a cause of action premised upon a

hindsight review of faulty predictions as to business success. "Corporate officials need

not be clairvoyant; they are only responsible for revealing those material facts reasonably

available to them. . . . Thus, allegations that defendants should have anticipated future

events and made certain disclosures earlier than they actually did do not suffice to make

out a claim of securities fraud." Novak, 216 F.3d at 309 (citing Denny v. Barber, 576

F.2d 465, 470 (2d Cir. 1978)); see also Acito v. IMCERA Group, Inc., 47 F.3d 47, 53 (2d

Cir. 1995) ("lack of clairvoyance simply does not constitute securities fraud"). "[A]s

long as the public statements are consistent with reasonably available data, corporate

officials need not present an overly gloomy or cautious picture of current performance

and future prospects." Novak, 216 F.3d at 309.

B. SFAS 142, the Testing of Impairment to Goodwill and CBS's October
2010 Announcement of Its Impairment Test.

As set forth above, the Complaint premises its securities fraud claim on

the contention that the defendants unlawfully failed to record timely impairment charges

to the Company's goodwill value. I begin the analysis of plaintiff's fraud claim by

reviewing the standards for valuing a company's goodwill.

GAAP includes SFAS 142, which is promulgated by the Financial

Accounting Standards Board. "GAAP does not prescribe a fixed set of rules, but rather

represent the range of reasonable alternatives that management can use." Ganino v.

Citizens Utilities Co., 228 F.3d 154, 159 n.4 (2d Cir. 2000) (quotation marks omitted).

Financial statements filed with the SEC that are not in accordance with GAAP are

presumed to be misleading or inaccurate.  SEC Regulation S-X, 17 C.F.R. § 210.4-

01(a)(1).  The SEC recognizes the standards of the Financial Accounting Standard Board

as authoritative.  See Statement of Policy on the Establishment and Improvement of

Accounting Principles and Standards, SEC Release No. AS-150, 1973 WL 149263, at *1

(Dec. 20, 1973).

   SFAS 142 sets the methods by which a company values goodwill.

Goodwill measures the value of a company's intangible assets over and above the fair

market value of identifiable assets and liabilities – as described in SFAS 142, "the

premium related to expected synergies . . . ."  SFAS 142, attached at Danilow Dec. Ex. 3;

see also Aswath Damodaran, Damodaran on Valuation 423 (2d ed. 2006) ("The most

charitable interpretation of goodwill is that it measures the estimated value of growth

assets in the target company; growth assets are investments that the target company is

expected to make in the future.").  Goodwill is measured by each individual reporting

unit of a company, and is not established in a single calculation for the enterprise as a

whole.  SFAS 142 ¶¶ 18, 21.  Different reporting units within a company may test

goodwill impairment at different times in the fiscal year.  Id. ¶ 26.

   SFAS 142 prescribes the frequency with which companies are to test for

impairment to goodwill.  It requires that goodwill testing be made on an annual basis, and

that "in certain circumstances," goodwill must be tested more than once per year.  Id.

¶ 26.  In the case of the latter, goodwill "shall be tested for impairment between annual

tests if an event occurs or circumstances change that would more likely than not reduce

the fair value of a reporting unit below its carrying amount." Id. ¶ 28 (emphasis added).

SFAS 142 offers examples of events that should prompt a company to test for impairment. Some of them are concrete in nature, and may lend themselves to being traced to a specific point in time. There may be "[a]n adverse action or assessment by a regulator," "[a] loss of key personnel," "[t]he testing for recoverability under Statement 144 of a significant asset group within a reporting unit," or "[r]ecognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit." (SFAS 142 ¶¶ 28(b), (d), (f), (g).) Such discrete events – provided that they would "more likely than not" reduce the fair value of a reporting unit below its carrying amount – would seem to be event-based, and lend themselves to readily identifiable dates.

Other examples cited in SFAS 142 as potential triggers for impairment testing are not necessarily tied to a single fixed event. They include "[a] significant adverse change . . . in the business climate," "[u]nanticipated competition" or "[a] more-likely-than-not expectation that a reporting unit or significant portion of a reporting unit will be sold or otherwise disposed of." (SFAS 142 ¶¶ 28(a), (c), (e).) In the case of a "significant adverse change" in the business climate or the presence of "unanticipated competition," there may be multiple contributing factors relevant to whether it is "more likely than not" that a reporting unit has lost fair value, and consequently whether an otherwise unscheduled impairment test is required under SFAS 142.

As described by defendants' counsel, in the third fiscal quarter of 2008, the United States encountered "perhaps the greatest debt market turmoil since the Great

Depression," which threatened and bankrupted major American financial institutions.[2]

(Mem. in Support at 13.) At the time of its October 10 announcement, CBS stated that

the "continued economic slowdown in the United States has adversely affected

advertising revenue," prompting the Company to undertake "an interim impairment test

on its existing goodwill" and intangible assets, likely to result in a charge of $14 billion.

(Compl. ¶ 57.) As noted below, the Company's total writedown was approximately

$14.1 billion, $10.99 billion of which was attributed to loss of goodwill value, with the

remainder going toward other intangible assets. (See Danilow Dec. Ex. 2.)

In its 10-Q filed on November 4, 2008, CBS confirmed that it would take

a non-cash impairment charge to goodwill amounting to $14.1 billion. (Compl. ¶ 78.)

As explained in the Form 10-Q:

> [SFAS 142] requires the Company to perform a fair value-based
> impairment test of goodwill and other intangible assets with indefinite
> lives annually and also between annual tests if an event occurs or if
> circumstances change that would more likely than not reduce the fair
> value of a reporting unit below its book value. During the third quarter of
> 2008, the Company performed an interim test as a result of its assessment
> of factors such as the continuation of adverse market conditions, which
> affected the Company's market value and trading multiples for entities
> within the Company's industry, as well as the continued economic
> slowdown which has adversely affected the Company's advertising
> revenues, primarily at the Company's local businesses. . . .
>
> As a result of this impairment test, the Company recorded a non-cash
> impairment charge of $14.12 billion in the third quarter of 2008 to reduce
> the carrying value of goodwill by $10.99 billion and intangible assets by
> $3.13 billion. The charge was reflected as a reduction to goodwill at the
> Television segment of $5.81 billion, the Radio segment of $2.33 billion
> and the Outdoor segment of $2.85 billion as well as a reduction to the
> carrying value of intangible assets related to FCC licenses at the
> Television segment of $2.13 billion and the Radio segment of $984.6

million, and franchise agreements at the Outdoor segment of $8.2 million. (attached at Danilow Dec. Ex. 2.)

The plaintiffs do not point to any triggering event between the end of CBS's second quarter of fiscal year 2008 – when, on July 31, CBS announced a quarterly boost in goodwill value of $1.6 billion – and the announcement of October 10 that CBS expected to incur an impairment charge to goodwill. Rather, according to the plaintiffs, by October 10, the general decline of the stock market caused the value of CBS shares to dip below levels specified in the loan made for Redstone's benefit, as set forth in that loan's Principal Payment Covenants. (Compl. ¶ 13.) Had CBS properly accounted for its goodwill value, the Complaint asserts, it would have incurred an impairment charge "in steps beginning no later than the first quarter of 2008 and probably sooner." (Compl. ¶ 87.)

### C. The Complaint Fails to Allege that CBS Committed Securities Fraud by Belatedly Testing for Impairment to Goodwill.

The plaintiffs contend that the gap between the Company's book value and its market capitalization should have prompted the defendants to test for impairment earlier than October 2008. Specifically, the Complaint asserts that the Company should have tested for impairment no later than the first quarter of 2008. Paragraph 77 of the Complaint summarizes why plaintiffs contend that an earlier impairment test was required. It notes that "[a]s of December 31, 2007, CBS's book value was $3.2 billion greater than its market capitalization of $18.3 billion." (Compl. ¶ 77.) This gap between book value and market capitalization continued to grow throughout 2008. By the close of the first quarter of 2008, book value exceeded market capitalization by $6.9 billion, and by the end of the second quarter of 2008, book value exceeded market capitalization by

$8.8 billion.  (Compl. ¶ 77.)

        While the Complaint has set forth the considerations that plaintiffs contend required a test of goodwill impairment, it does not adequately allege that the failure to take an earlier impairment charge amounts to securities fraud.  This is because the plaintiffs do not set forth a coherent explanation as to what facts were known to the defendants in February 2008 that required them to test for impairment of goodwill, offering instead an impairment standard that apparently lacks support from the text of SFAS 142 or any other authority.

        SFAS 142 requires a test of goodwill impairment based on, among other reasons, a significant, adverse change in the business climate, making it more likely than not that that a reporting unit's fair value has fallen below its carrying amount.  SFAS 142 ¶ 28(a).  The Complaint does not, as plaintiffs argue, plausibly allege or plead with particularity "why the impairment charge should have been recognized" in the first quarter of 2008.  (Opp. Mem. at 12; see also Compl. ¶ 87 (the Company was "required to take such charges in steps beginning no later than the first quarter of 2008 and probably sooner.").)  It merely notes the existence of a difference between market capitalization and book value.  The bright-line test suggested by the plaintiffs – that SFAS 142 requires a company to test for impairment whenever book value exceeds market capitalization – is unsupported by any citation, and could make a company potentially liable for securities fraud based on an unexpected dip in its share price.  As the defendants point out, the Complaint has not adequately alleged a relationship between market capitalization and book value as a trigger for impairment.  (Def. Reply Mem. at 6.)[3]

---

[3] While I need not and do not consider it on this motion, defendants point to the remarks of Robert G. Fox III, an accounting fellow in the SEC's Office of the Chief Accountant, who stated that "the requirements of

The Complaint does not cite to any knowledge by the defendants or event unique to the first quarter of 2008 that placed the defendants on notice of likely impairment to goodwill. It notes that a "decline in advertising revenues occurred throughout 2008," (Compl. ¶ 81; emphasis in original) indicating that the yearlong decline necessitated an impairment test in the first quarter. But a retrospective critique asserting that advertising revenues declined throughout the year does not amount to an allegation of knowledge on the part of the defendants that, during the first quarter of 2008, advertising revenues would slump throughout the year. See Acito, 47 F.3d at 53 (lack of clairvoyance does not amount to fraud). To the extent that the Complaint discusses specific developments of the first quarter, it does not allege any event or series of events that would trigger a test for impairment under SFAS 142. The Complaint notes that in the first quarter of 2008, television advertising sales had declined in comparison to the prior year due to the timing of the NCAA Men's Basketball Tournament and CBS's loss of the broadcast rights to the Super Bowl. Plaintiffs do not allege that this information was concealed or that it required the Company to test for impairment. (Compl. ¶ 81.)

The rather arbitrary nature of plaintiffs' fraud theory is underscored by the Complaint's allegations of the relationship between book value and market capitalization prior to the first quarter of 2008. As the Complaint notes, by the close of fiscal year 2007, the Company's book value already exceeded its market capitalization by $3.2 billion. (Compl. ¶ 77.) Plaintiffs do not adequately explain why, under their theory, such

Statement 142 do not require that goodwill be marked-to-market (or marked to market capitalization)." These remarks are published on the SEC's website. See Remarks by Robert G. Fox III before the 2008 AICPA National Conference on Current SEC and PCAOB Developments (Dec. 2008), available at http://www.sec.gov/news/speech/2008/spch120808rgf.htm.

a gap would not have required impairment testing at some point during fiscal year 2007 rather than the first quarter of 2008. Plaintiffs do not plausibly and adequately explain why the failure to test for goodwill impairment in the first quarter of 2008 amounted to securities fraud.

The plaintiffs' conclusory assertion of fraud fails to satisfy the particularity requirements of Rule 9(b) and the PSRLA. See Rombach, 355 F.3d at 172 (plaintiffs must explain why statements are fraudulent and misleading); ATSI, 493 F.3d at 99 ("A securities fraud complaint based on misstatements must . . . explain why the statements were fraudulent. Allegations that are conclusory or unsupported by factual allegations are insufficient.") (citations omitted); Novak, 216 F.3d at 306 (plaintiffs must "explain why the statements were fraudulent"). Allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud. Acito, 47 F.3d at 53; accord Stevelman v. Alias Research, Inc., 174 F.3d 79, 84 (2d Cir. 1999). In other words, "plaintiffs cannot rest on their say-so" in asserting that "statements are fraudulent; they must explain why." Rombach, 355 F.3d at 175.

This is an instance of plaintiffs resting on their say-so. Plaintiffs focus on the Company's use of the word "recent" in describing market conditions in its October 10, 2008 announcement that CBS's goodwill had likely been impaired. (e.g., Compl. ¶¶ 80, 81, 87; Opp. Mem. at 2 ("[T]he Company's representation that the interim impairment test was attributable to 'recent' events is clearly a fabrication."), 7.) They argue that use of the word "recent" misstated CBS's predicament, because the Company already confronted decreasing advertising revenues. But SFAS 142 – upon which plaintiffs base their fraud theory – requires testing only once it is "more likely than not"

that that a reporting unit's fair value had fallen below its carrying amount, based on, among other things, adverse changes in market conditions.  This formulation necessarily involves judgment and discretion on the part of a company in deciding whether to undertake an intra-year impairment test.  GAAP "tolerate[s] a range of 'reasonable' treatments, leaving the choice among alternatives to management."  Thor Power Tools Co. v. Comm'r of Internal Revenue, 439 U.S. 522, 544 (1979); cf. SEC v. Price Waterhouse, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992) (stating in the context of auditor liability that a section 10(b) plaintiff "must prove . . . that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.").  Indeed, the Complaint may even be correct in noting that the growing gap between book value and market capitalization "substantially increased the likelihood of an impairment," (Compl. ¶ 77) but that does not allege why impairment was required in the first quarter of 2008, or why, by the first quarter of 2008, it already was "more likely than not" that the fair value of CBS's reporting units had fallen below their carrying amounts.[4]

Courts including this one have evaluated securities fraud claims premised on allegedly untimely writedowns to goodwill.  This Court previously dismissed a complaint asserting violations of Section 10(b) and Rule 10b-5 due to the failure to take timely writedowns to goodwill.  See City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Group Pub. Ltd. Co., 655 F. Supp. 2d 262 (S.D.N.Y. 2009).  There, the Complaint was dismissed because plaintiff failed to allege a sufficiently discernable point

---

[4] In asserting that the Company failed to make a timely impairment test, the Complaint focuses almost exclusively on CBS at an enterprise-wide level. SFAS 142 requires that goodwill be calculated piecemeal by an entity's individual reporting units. SFAS 142 ¶ 18. It defines a reporting unit as "an operating segment," or a component of an operating segment. SFAS 142 ¶ 30.

in time when an impairment charge should have been taken, and because the theory of liability was a retrospective critique based largely on the defendants' overconfidence in the future of 3G telephone technology. Id. at 270-72. While the allegations in the present Complaint are more detailed than those of City of Sterling Heights, they nevertheless fail to explain why, if accepted as true, the failure to take a writedown at an earlier point in time amounted to fraud. Id. at 269-70 (dismissing complaint that failed to allege "which specific losses known to the Company should have triggered an impairment charge.").

This conclusion is consistent with other opinions that have dismissed securities fraud claims directed toward the timeliness of a company's writedown to assets, either tangible or intangible. See, e.g., Caiafa v. Sea Containers Ltd., 525 F. Supp. 2d 398, 410 (S.D.N.Y. 2007) (dismissing securities fraud claim because complaint failed to allege why writedown should have been taken earlier under the SFAS "more likely than not" standard); In re Loral Space & Commc'ns Ltd. Sec. Litig., 2004 WL 376442, at *17 (S.D.N.Y. Feb. 27, 2004) (noting in a scienter analysis that "the evolving poor performance of [the company] during 2000 was publicly disclosed. When the impairments became so severe as to require specific accounting charges, and whether the requirements of the accounting principles were satisfied, necessarily involved issues of judgment."); In re Radian Sec. Litig., 612 F. Supp. 2d 594, 615 (E.D. Pa. 2009) (complaint failed to stated securities fraud claim because "[e]ven if an impairment of [the company's] investment did occur at some point earlier than [the company] ultimately stated, the plaintiffs do not allege facts to show that [the company's] decision not to report whatever impairment may have existed until July 2007 involved not merely

simple, or even inexcusable negligence, but an extreme departure from the range of

reasonable business treatments permitted under GAAP"); In re Wet Seal, Inc. Sec. Litig.,

518 F. Supp. 2d 1148, 1160-62 (C.D. Cal. 2007) (complaint's allegations as to timeliness

of writedowns lacked particularity as to purported GAAP violations and therefore failed

to satisfy PSLRA and Rule 9(b)); Rosen v. Textron, Inc., 321 F. Supp. 2d 308, 326-27

(D.R.I. 2004) ("While the Amended Complaint does set forth in detail the GAAP

standards that allegedly required the writedown to occur in October 2000, it fails to set

forth in sufficient detail facts showing that [the company] knew prior to September 2001

that the writedown was required, or that its estimated future cash flows . . . would be less

than the carrying amount.").

By way of contrast, securities fraud claims directed toward the failure to

write down assets have survived scrutiny under Rule 9(b) and the PSLRA when plaintiffs

have identified red flags that should have prompted disclosure by the company. Plaintiffs

have cited a number of such cases, which are distinguishable from the present case to the

extent that defendants allegedly concealed key losses, cited identifiable sources of loss or

did not involve a "more likely than not" analysis under the SFAS.[5]

In this case, the plaintiffs' fraud theory is premised upon a gap between

---

[5] See Akerman v. Arotech Corp., 608 F. Supp. 2d 372, 387-88 (E.D.N.Y. 2009) (plaintiffs successfully pleaded securities fraud claim by alleging that defendants knowingly failed to disclose the true condition of acquired firm, including lost business and impaired goodwill and thereby "furthered the alleged scheme" to conceal the company's condition); In re Flag Telecom Holdings, Ltd. Sec. Litig., 352 F. Supp. 2d 429, 465-66 (S.D.N.Y. 2005) (plaintiffs successfully pleaded securities fraud claim when company failed to take writedown to assets despite consistently missing sales targets by 80-90%); In re Omnicom Group Inc. Sec. Litig., 2005 WL 735937, at *7-9 (S.D.N.Y. Mar 30, 2005) (complaint successfully alleged that defendants unlawfully failed to write down internet investments after steep declines in revenue and share prices); In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d 319, 342-43 (S.D.N.Y. 2004) (complaint successfully alleged that defendants unlawfully failed to write down value of tangible assets despite steep drops in demand and market value); In re Vivendi Universal, S.A. Sec. Litig., 381 F. Supp. 2d 158, 176-77 (S.D.N.Y. 2003) (plaintiffs successfully pleaded securities fraud claim when company improperly recognized revenues and an impairment to goodwill was incurred immediately upon arrival of new management).

book value and market capitalization. They do not allege that other events or non-public

information required impairment in the first quarter of 2008. Plaintiffs' purported trigger

for impairment testing lacks support in the text of SFAS 142 and in relevant caselaw.

Because the allegation is conclusory, Rombach, 355 F.3d at 174, and retrospective,

Novak, 216 F.3d at 309, it fails to state a claim of securities fraud.

> D. Redstone's Non-Disclosure of the National Amusements Loan Does
> Not Support a Claim of Securities Fraud.

Defendants also move to dismiss plaintiffs' securities fraud claim to the

extent that it raises non-disclosure of the $1.6 billion loan to Redstone-related interests.

There is no allegation that CBS extended or guaranteed the loan nor that any CBS assets

secured the loan. It was a loan by third parties to Redstone-related interests. While

arguing that the loan's non-disclosure constitutes a material omission, plaintiffs also

contend that the loan is primarily relevant as evidence of the defendants' motivations for

allegedly delaying the impairment charge to goodwill. As described in plaintiffs'

opposition memo, the "[d]efendants evidently misapprehend the role the concealment of

the Principal Payment Covenant plays in this litigation. While this is unquestionably a

material omission, the National Amusements loan chiefly provided incentive for the

artificial inflation of CBS stock to benefit defendant Redstone." (Opp. Mem. at 15 n.10.)

The Complaint sets forth allegations as to the relationship between CBS's

share price and the terms of Redstone's loan, but does not, on its face, allege that the

loan's non-disclosure was a material omission constituting a stand-alone act of securities

fraud. In opposition, plaintiffs cite Item 403(b) of SEC Regulation S-K, which requires

members of a company's management to disclose "the amount of shares that are pledged

as security . . . ." 17 C.F.R. § 229.403(b). Subsection (c) requires disclosure of a pledge

of securities "which may at a subsequent dates result in a change in control of the registrant." Id. § 229.403(c).

The reliance on this regulatory language, which is quoted in the plaintiffs' opposition memo, does not substitute for particularized allegations in the Complaint. The Complaint does not allege that CBS shares were pledged as security by Redstone or could have resulted in a change of control.[6] The Complaint simply asserts that the loan "included a critical covenant requiring significant principal payments on the loans if the value of the CBS and Viacom stock under National Amusement's [sic] control fell below certain levels." (Compl. ¶ 5; emphasis omitted.) True, there is alleged to be a nexus between CBS's stock price and repayment of principal on the loan, but nowhere does the Complaint assert that Redstone's shares functioned as security on the loan. To the extent that plaintiffs assert that the failure to disclose the loan amounts to a material omission, and, hence, securities fraud, that claim is dismissed.

## II.    The Plaintiffs' Claim of Section 20(a) Liability is Dismissed.

Count II of the Complaint alleges that the Individual Defendants are separately liable as control persons under Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a). "In order to establish a prima facie case of liability under § 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary

---

[6] Defendants note that when Redstone sold stock to satisfy his obligations under the loan's covenants, they were of non-voting shares. (Reply Mem. at 8; Danilow Dec. Ex. 28.) Additionally, the Complaint is less than clear about the nature of the loan. It states that Redstone, "acting on behalf of his alter-ego National Amusements, borrowed a total of $1.6 billion from various lenders." (Compl. ¶ 5.) This could be read to allege that National Amusements is a sham corporation, and that any loan to it was made for Redstone's personal benefit. Alternatively, it could be read to allege that Redstone personally took out a loan for the benefit of National Amusements. Elsewhere, the Complaint refers both to loans (plural) and a loan (singular), sometimes doing both in the same sentence. (See Compl. ¶ 5, 13.) Any proposed amended complaint may benefit from greater clarity as to the underlying character of the loan(s).

violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir.1998) (quotation marks omitted).  Because the Complaint fails to plead a primary violation, the Section 20(a) claim is dismissed.

      III.     Leave to Move to Amend is Granted.

      Plaintiffs assert that in the event that this Court grants the defendants' motions, they should be granted leave to amend the Complaint to cure any pleading defects. The premotion conference is waived for any motion to amend filed by plaintiffs prior to April 30, 2010. See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, 531 F.3d 190, 197 (2d Cir. 2008) (while PSLRA required dismissal of complaint for failure to plead scienter, the district court appropriately granted leave to amend); ATSI, 493 F.3d at 108 ("District courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under 9(b)."). Any such motion should annex the proposed pleading, together with a marked-to-show-changes copy.

CONCLUSION

      The motion to dismiss is granted. Plaintiffs may file a motion for leave to amend on or before April 30, 2010. The Clerk is directed to amend the caption consistent with footnote 1.

- 25 -

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
         March 16, 2010