UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------x

| | |
|---|---|
| CITY OF OMAHA NEBRASKA CIVILIAN EMPLOYEES' RETIREMENT SYSTEM and CITY OF OMAHA POLICE AND FIRE RETIREMENT SYSTEM, Individually and On Behalf Of All Others Similarly Situated,<br><br>  Plaintiffs,<br><br>  vs.<br><br>CBS CORPORATION, LESLIE MOONVES, FREDRIC G. REYNOLDS and SUSAN C. GORDON,<br><br>  Defendants. | Civil Action No. 08-CV-10816 (LBS)<br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO AMEND** |

----------------------------------------x

I.  **INTRODUCTION**

Lead Plaintiffs, the City of Omaha, Nebraska Civilian Employees' Retirement System and the City of Omaha Police and Fire Retirement System (the "Omaha Funds"), by and through their attorneys, seek leave to amend their operative complaint. A copy of the [Proposed] Second Amended Complaint ("SAC") is attached hereto as Exhibit A. A marked-to-show-changes copy is attached hereto as Exhibit B. As demonstrated herein, the requested relief is appropriate.

II.  **UNDER THE FEDERAL RULES, LEAVE TO AMEND SHOULD BE FREELY GIVEN**

Federal Rule of Civil Procedure 15(a) states that leave to amend "shall be freely given when justice so requires." In analyzing this directive, the United States Supreme Court has stated that:

> [i]n the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. – the leave sought should, as the rules require, be 'freely given.'

*Foman v. Davis*, 371 U.S. 178, 182 (1962). Following the Supreme Court's lead, the Second Circuit has recognized that "if the plaintiff has at least colorable grounds for relief, justice . . . require[s]" that its motion to amend be granted. *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 783 (2d Cir. 1984).

### III.  LEAVE TO AMEND IS PROPER IN THIS INSTANCE

As this Court is aware, Lead Plaintiffs brought this class action (the "Action") on behalf of purchasers of the common stock[1] of CBS to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  More particularly, Lead Plaintiffs assert that Defendant Redstone and CBS embarked on a campaign to artificially inflate the value of CBS stock in violation of the Exchange Act so that Defendant Redstone would not have to make mandatory principal payments to certain lenders as required by the principal payment covenant in the National Amusement loan.  Indeed, to fuel the Defendants' machinations, Defendants did not write down goodwill and another intangible asset, Federal Communication Commission licenses (collectively "goodwill"), to their fair values during the Class Period even though it was clear that their value was substantially impaired.  Lead Plaintiffs further aver that despite the deteriorating financial condition at CBS, Defendants continued to publicly tout the strength of CBS's assets, which, in turn, falsely assured investors of CBS's ability to continue to grow the Company and increase profits.

On March 16, 2010, this Court, after considering submissions from both Lead Plaintiffs and Defendants, dismissed Lead Plaintiffs' complaint (the "Original Complaint"), stating "[t]he Complaint sets forth allegations as to the relationship between CBS's share price and the terms of Redstone's loan, but does not, on its face, allege that the loan's non-disclosure was a material omission constituting a stand-alone act of securities fraud." Memorandum and Order ("Order") dated March 16, 2010 at 22.  By

---

[1]   CBS has issued and outstanding both Class A (voting shares, traded under the symbol CBS/A) and Class B (nonvoting shares, traded under the symbol CBS).  Class A and Class B shares are collectively referred to as "Common Stock" herein. Lead Plaintiffs bring claims on behalf of the shareholders of both classes.

virtue of this same Order, however, the Court granted Lead Plaintiffs leave to file a motion to amend the Original Complaint and waived the pre-motion conference if such motion was filed by Lead Plaintiffs prior to April 30, 2010. *Id.* at p. 24.

In accordance with this Court's Order and based on the information now available to Lead Plaintiffs and their Counsel, Lead Plaintiffs request leave to amend their Complaint to revise and refine their allegations. The substance of Lead Plaintiffs' proposed amendments are summarized below.

### A. Grounds for Amendment

In the March 16, 2010 Order, this Court held that "the plaintiffs do not set forth a coherent explanation as to what facts were known to the defendants in February 2008 that required them to test for impairment of goodwill, offering instead an impairment standard that apparently lacks support from the text of SFAS 142 or any other authority." *Id*. at 16. The Court further expressed its concern that "[t]he bright-line test suggested by the plaintiffs – that SFAS 142 requires a company to test for impairment whenever book value exceeds market capitalization – is unsupported by any citation, and could make a company potentially liable for securities fraud based on an unexpected dip in its share price." As described below, Plaintiffs' allegations in the SAC address these concerns, and leave to amend should be permitted.

#### i. Defendants Were Obligated to Test for Interim Impairment

Plaintiffs allege that the SFAS 142 analysis required of Defendants here is a two-part process. The initial component requires that reporting companies conduct an interim impairment test upon the occurrence of certain triggering events. Such triggering events may be tied to a "specific point in time," including, for example, "[a]n adverse action or

- 3 -

assessment by a regulator," "[a] loss of key personnel," etc. *See* discussion in Opinion at 13. Additionally, the Court identified certain other triggering events, "not necessarily tied to a single event," including "a significant adverse change in the business climate." *Id.* Among these, clearly, is the circumstance present here, where the market value of CBS stock radically exceeded the book value of its assets.

On this point there can be little dispute, as Robert G. Fox III, a staff member of the Securities and Exchange Commission (the "SEC"), has confirmed in recent remarks that while there is no bright line rule requiring that goodwill impairment be based upon the relation of book value to market capitalization: *"Statement 142 does require a measurement of goodwill impairment when the fair value of the reporting unit falls below the carrying value of that reporting unit."* On this point the SEC staff is unequivocal. Moreover, such principle is not always applicable to single day stock price movements,[2] but instead, Mr. Fox noted, "in some cases, I believe it would be more reasonable to look at market capitalization over a reasonable period of time leading up to the date at which you are testing from potential impairment. However, *I would also note that it would not be reasonable for a registrant to simply ignore recent declines in their stock price,* as the decline are likely indicative of factors the registrant should consider in their determination of fair value, such as a more than temporary repricing of the risk inherent in any company's equity that results in higher required rate of return or a decline in the

---

[2] While Mr. Fox's comments make clear that a single day price drop could, in some circumstances, compel an immediate interim impairment test, that is not the case in the matter at bar. As summarized in ¶ 78, the book value of the Company's stock exceeded market by billions of dollars for some 6 months at the time plaintiffs allege an impairment test was necessary.

market's estimated future cash flows of the company."[3]  While both the SEC and the Company itself acknowledge that the discrepancy between market and book values necessitates an interim impairment analysis, it is critical to note, that this first element of the two part test merely obligates an entity to conduct such analysis, not incur an impairment charge.

### ii. Defendants Were Obligated to Take an Impairment Charge at the End of the First Quarter of 2008

With the necessity of a trigger event now properly alleged, the second step of the SFAS142 process necessitates an impairment calculation, typically by application of discounted cash flow testing.  Again, there is no dispute that Defendants agree that this is the proper methodology, as they reveal,

> The estimated fair value of each reporting unit was computed principally based upon the present value of future cash flows (Discounted Cash Flow Method) and both the traded and transaction values of comparable businesses (Market Comparable Method). The Discounted Cash Flow Method and Market Comparable Method resulted in substantially equal fair values.

SAC at ¶53 quoting the Company's Form 10-Q for the period ended September 30, 2008. Regarding this second element of the application of SFAS 142, the Court expressed concern that "the Complaint does not cite to any knowledge by the defendants or event unique to the first quarter of 2008 that placed the defendants on notice of likely impairment of goodwill."  Order at 17.

---

[3]  Moreover, Defendants are not strangers to this requirement, as it served as their basis for the $14 billion impairment charge in October of 2008.  In its third quarter 2008 Form 10-Q, CBS cited the effect of "the continuation of adverse market conditions [on] the Company's *market value* and trading multiples for entities within the Company's industry" as one of the factors that triggered its impairment testing during Q3'08. (Emphasis added.)

Responding to these concerns, the SAC now provides detailed business segment revenue numbers showing unequivocally that the significant fall-off in advertising sales mandated an interim impairment charge. *See* ¶¶96-108. More particularly, as made plain by the chart titled "Spending on CBS Network TV (De-seasonalized)," (¶100) declines in spending on the Company's network television accelerated markedly from January through March 2008. Similarly, spending on radio and outdoor advertising, captured in the charts and related discussion titled "De-seasonalized Spending – Radio Market Segment" (¶102) and "De-seasonalized Spending – Outdoor Market Segment" (¶106) again reveal sharp declines in the first quarter of 2008. Faced with this profound slowdown, and obligated to perform an interim impairment test as a result of the considerable and long-lived discrepancy in market and book values, the Company was required to write down its intangibles at the end of the first quarter, not wait until the third quarter of 2008.

### iii. The Loans to National Amusements, Inc. Provide Strong Indicia of Motive, and the Lack of Disclosure Thereof Constitutes a Material Omission

Finally, the Court instructed Plaintiffs that "[a]ny proposed amended complaint may benefit from greater clarity as to the underlying character of the loan(s) [to National Amusements, Inc.]." In response, Plaintiffs have now articulated: (i) the existence of the loans; (ii) the nature of the covenants contained therein, which required principal payments in the event CBS stock fell below certain threshold price levels; and (iii) that activation of such principal payment covenants and the attendant sale of hundreds of

millions of dollars of CBS and Viacom stock (¶¶109-114).[4]  As set forth in the SAC, the grounds for these allegations are statements made personally by Mr. Redstone, and present strong indicia of scienter.

Moreover, these facts regarding NAI, standing alone, comprise the type of information necessary for shareholders to make an informed decision on their investment in CBS, particularly in light of the Company's falling stock price.  Failure to apprise investors of their existence is an actionable material omission.  Furthermore, this omission violates 17 C.F.R. § 229.403 which obligates a registrant to "describe *any arrangements* . . . the operation of which may at a subsequent date result in a change of control of the registrant."  (Emphasis added.)

## IV. CONCLUSION

Based upon the foregoing, and the Proposed Second Amended Complaint incorporated herein, plaintiffs respectfully request they be afforded to opportunity to amend the operative complaint.

---

[4]  Plaintiffs do not allege that NAI was a sham corporation, nor do they allege that the loan to NAI was for Redstone's direct personal benefit, aside from ownership interest in NAI.

DATED: April 30, 2010

Respectfully submitted,

ROBBINS GELLER RUDMAN & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD

*/s/ David A. Rosenfeld*
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

Liaison Counsel for Plaintiffs

CARNEY WILLIAMS BATES BOZEMAN &
PULLIAM, PLLC
Allen Carney
Curtis L. Bowman
Marcus N. Bozeman
Randall K. Pulliam
11311 Arcade Drive, Suite 200
Little Rock, AR 72212
Telephone: (501) 312-8500
Facsimile: (501) 312-8505

Lead Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I, David Rosenfeld, hereby certify that on April 30, 2010, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system and the following counsel were served via the ECF pursuant to the local rules on electronic filing:

James W. Quinn
Greg A. Danilow
Yedudah L. Buchweitz
   Weil, Gotshal & Manges, LLP
767 Fifth Avenue
New York, NY  10153-0119

J. Allen Carney
Curtis L. Bowman
Marcus N. Bozeman
Carney Williams Bates
   Bozeman & Pulliam, PLLC
11311 Arcade Drive, Suite 200
Little Rock, Arkansas  72212

Samuel H. Rudman
David A. Rosenfeld
   Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY  11747