UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————x
                                                  :
CITY OF OMAHA NEBRASKA CIVILIAN        :
EMPLOYEES' RETIREMENT SYSTEM and       :
CITY OF OMAHA POLICE AND FIRE          :
RETIREMENT SYSTEM, Individually and    :
On Behalf Of All Others Similarly Situated,  :
                                                  :
                              Plaintiff,          :       Civil Action No. 08-CV-10816 (PKC)
                                                  :
              vs.                                 :
                                                  :
CBS CORPORATION, SUMNER                 :
REDSTONE, LESLIE MOONVES,               :
FREDRIC G. REYNOLDS and                 :
SUSAN C. GORDON,                        :
                                                  :
                              Defendants.         :
————————————————————————x


## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
*Counsel for Defendants CBS Corporation,*
*Sumner Redstone, Leslie Moonves,*
*Fredric G. Reynolds and Susan C. Gordon.*


May 24, 2010

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ........................................................................................................................ 5

I.    PLAINTIFFS' MOTION FOR LEAVE TO AMEND SHOULD BE DENIED
      BECAUSE THE PROPOSED AMENDMENT WOULD BE FUTILE ............................ 5

      A.    Plaintiffs Have Not Pled That Defendants Were Obligated To Test For An
            Interim Impairment Before They Did .............................................................. 6

            1.    Market Capitalization Exceeding Book Value Does Not
                  Necessitate An Interim Impairment Test Whether Designated As
                  An Independent Test Or A "Significant Adverse Change In The
                  Business Climate" .................................................................................... 6

            2.    The New Allegations Are Fatally Imprecise In Alleging When
                  CBS Should Have Tested For An Interim Impairment ........................... 9

      B.    Plaintiffs Have Not Pled That Defendants Were Obligated To Record An
            Impairment Charge At The End Of The First Quarter Of 2008 ........................ 10

            1.    Plaintiffs' New Allegations Of Advertising Spending Declines Do
                  Not Establish That Defendants Were Obligated To Record An
                  Earlier Impairment .............................................................................. 11

                  a.    The New Allegations Do Not Show Anything About The
                        Reporting Units' Fair Value .......................................................... 12

                  b.    The New Allegations Do Not Establish That Defendants
                        Had Knowledge That CBS Was Required To Record An
                        Impairment And Fraudulently Ignored It ....................................... 14

            2.    Statements from Plaintiffs' Latest Low-Level Witness Do Not
                  Establish That Defendants Knew They Had To Record An Earlier
                  Impairment ............................................................................................ 16

      C.    The Allegations Concerning The NAI Loans Do Not Cure The
            Deficiencies Identified In The Court's Order .................................................. 17

            1.    The Allegations Concerning The NAI Loans Do Not Support A
                  Separate Claim Of Securities Fraud ...................................................... 17

            2.    Plaintiffs Still Do Not Plead Motive With Respect To The NAI
                  Loans ...................................................................................................... 20

                  a.    The NAI And Redstone Motive Allegations Are A Red
                        Herring .......................................................................................... 20

                  b.    Even If An Impairment Were Required, The NAI Loans Do
                        Not Supply A Motive ..................................................................... 20

i

**TABLE OF CONTENTS**
**(continued)**

**Page**

D.    Plaintiffs Have Again Failed To Plead Any False Or Misleading Statements ........................................................................................................21

E.    Plaintiffs Have Again Failed to Satisfy <u>Tellabs</u> ....................................................22

CONCLUSION ........................................................................................................................23

# TABLE OF AUTHORITIES

## CASES

**Page(s)**

Acito v. IMCERA Group, Inc., 47 F.3d 47 (2d Cir. 1995) ...............................................11

Basic Inc. v. Levinson, 485 U.S. 224 (1988) ....................................................................18

Bellikoff v. Eaton Vance Corp., 481 F.3d 110 (2d Cir. 2007) ...........................................5

City of Omaha, et. al. v. CBS, et. al., 2010 WL 1029290
    (S.D.N.Y. Mar. 16, 2010) ............................................................................ passim

City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Group Pub. Ltd.
    Co., 655 F.Supp.2d 262 (S.D.N.Y. 2009) ...........................................................4, 8

City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Group Pub. Ltd.
    Co., 2010 WL 309009 (S.D.N.Y. Jan. 22, 2010) ...........................................4, 5, 15

ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.,
    553 F.3d 187 (2d Cir. 2009) .................................................................................20

First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763 (2d Cir. 2004) .....................15

Glazer v. Formica Corp., 964 F.2d 149 (2d Cir. 1992) .....................................................18

Kalnit v. Eichler, 264 F.3d 131 (2d Cir. 2001) .................................................................20

In re Pfizer, Inc. Derivative Sec. Litig., 307 Fed. Appx. 590 (2d Cir. 2009) ....................5

In re PXRE Group Ltd. Sec. Litig., 600 F.Supp.2d 510 (S.D.N.Y.), aff'd sub nom.
    357 Fed. Appx. 393 (2d Cir. 2009).......................................................................17

In re Radian Sec. Litig., 612 F.Supp.2d 594 (E.D. Pa. 2009) .................................4, 14, 17

In re Radian Litig., 2010 WL 1767195 (E.D. Pa. Apr. 30, 2010) ..........................4, 15, 17

Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004) .............................................................22

Shields v. Citytrust Bancorp, 25 F.3d 1124 (2d Cir. 1994) ........................................20, 21

Steinberg v. Ericsson LM Tel. Co., 2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008) ..........16

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007) ......................5, 22, 23

Thor Power Tools Co. v. Comm'r of Internal Revenue, 439 U.S. 522 (1979) ..................8

W. Va. Inv. Mgmt. Bd. v. Doral Fin. Corp., 344 Fed. Appx. 717 (2d Cir. 2009) ...........14

## OTHER AUTHORITIES

Goodwill and Other Intangible Assets, Statement of Fin. Accounting Standards
        No. 142 (Fin. Accounting Standards Bd. 2001)................................................. 7, 8

17 C.F.R. § 229.403 ........................................................................................ 18

Defendants CBS Corporation ("CBS"), Sumner Redstone, Leslie Moonves, Fredric G. Reynolds and Susan C. Gordon ("Defendants") respectfully submit this memorandum of law in opposition to the motion (the "Motion") of City of Omaha, Nebraska Civilian Employees' Retirement System and City of Omaha Police and Fire Retirement System ("Plaintiffs") for leave to file a proposed Second Amended Complaint (the "Proposed Complaint" or "P. Compl.").

## PRELIMINARY STATEMENT

The Proposed Complaint is nothing more than a longer and more colorful version of Plaintiffs' prior failed attempt to plead fraud with particularity. On March 16, 2010, this Court dismissed the Original Complaint in its entirety.[1] This Court held that Plaintiffs failed to allege with particularity "why [an] impairment was required in the first quarter of 2008, or why, by the first quarter of 2008, it was already 'more likely than not' that the fair value of CBS's reporting units had fallen below their carrying amounts," Order at *10, and why the so-called "failure to take an earlier impairment charge amounts to securities fraud." Id. at *9. Plaintiffs' Proposed Complaint does nothing to cure any of the fundamental pleading deficiencies identified by this Court in the Order. Plaintiffs' motion for leave to amend should therefore be denied as futile.

Plaintiffs argue that the Proposed Complaint now adequately pleads that CBS was required to test for an interim impairment earlier than it did. However, Plaintiffs still fail to allege when CBS was required to test for an impairment and what specific facts triggered that duty. Plaintiffs also claim that they no longer rely solely on the difference between CBS' market capitalization and its book value to allege that a test was required. Instead, they now claim that

---

[1] See City of Omaha, et. al. v. CBS, et. al., 2010 WL 1029290 (S.D.N.Y. Mar. 16, 2010) (the "Order"). Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in Defendants' Motion to Dismiss the Consolidated Amended Complaint (the "Def. Mem.") and their Reply In Further Support thereof. [Docket Nos. 39, 43]. Exhibits to the Declaration of Greg Danilow, [Docket Nos. 37-38] submitted with Def. Mem. shall be referred to as "Ex. __." Plaintiffs' Consolidated Amended Complaint, which was dismissed by the Order, will be referred to as the "Original Complaint." [Docket No. 33].

they have alleged an actual trigger: a "significant adverse change in business climate." However, the "significant adverse change in business climate" they identify is the difference between CBS' market capitalization and its book value. Thus, Plaintiffs new twist is a distinction without a difference. This Court already rejected this argument and illustrated the flaw in the theory that a goodwill impairment could be required solely because market capitalization drops below book value: "[t]he bright-line test suggested by the plaintiffs … is unsupported by any citation, and could make a company potentially liable for securities fraud based on an unexpected dip in its share price." Order at *9. In any event, there is no allegation that CBS did not in fact consider the decline in its stock price in determining whether to test for an impairment. In fact, the opposite is true. In its second quarter 10-Q, CBS disclosed that it may be required to conduct an interim impairment test before the next annual cycle, if there was a "continuation of existing market conditions." Ex. 8 at 49 (emphasis added). Plaintiffs have failed to mention this disclosure in their amendment. In any event , such "continuation" would have only triggered a testing, not necessarily required a recorded impairment.

Plaintiffs also allege that CBS knew that it should have recorded an impairment earlier because the same conditions that led it to take an impairment in October 2008 were present in the first quarter of 2008.[2] Plaintiffs focus on purported declines in advertising spending over the course of 2008. However, this claim is not new as the Original Complaint also focused on advertising revenues in early 2008, see, e.g., Ex. 35 at ¶ 81, and this Court already resoundingly rejected the notion that CBS could have predicted in early 2008 the severity or length of the economic crisis: "Corporate officials need not be clairvoyant … a retrospective critique

---

[2] Plaintiffs inexplicably have changed the class period start date from February 28, 2008 to April 29, 2008. This is emblematic of the fact that Plaintiffs have no idea when the purported fraud actually occurred.

asserting that advertising revenues declined throughout the year does not amount to an allegation of knowledge on the part of the defendants that, during the first quarter of 2008, advertising revenues would slump throughout the year." Order at *6, *9. Indeed, as is evident from CBS' second quarter 2008 risk factor disclosure, CBS was actively monitoring its goodwill accounting and disclosed the possibility of an interim impairment test if then-existing market conditions continued. Nevertheless, Plaintiffs claim that their Proposed Complaint now adequately pleads fraud because it adds additional data and certain charts regarding advertising spending. However, these charts and data, which are both inaccurate and irrelevant, do nothing to alter the Court's conclusion. For example, with respect to the Television reporting unit, Plaintiffs misleadingly focus only on advertising spending while ignoring that Television had other revenues, such as license fees and affiliate revenue, which made up for the advertising decline. Indeed, in both the first and second quarters of 2008, while the Television segment had declines in advertising revenue, its overall revenues increased in each quarter over the same prior-year period. Clearly any fair value calculation of the Television reporting unit must include all of its revenue streams, and not just some of them.

In addition, even assuming <u>arguendo</u> that Plaintiffs are correct and Defendants should have tested earlier (which is not adequately pled nor even close to being accurate), and even if Plaintiffs are correct, and Defendants should have recorded an impairment earlier (which is also not adequately pled and again inaccurate), absent more, this would merely plead an accounting error, and certainly not fraud. This Court dismissed the Original Complaint because Plaintiffs had not alleged anything to explain why any alleged accounting errors would constitute fraud. Order at *11 (the allegations "fail to explain why, if accepted as true, the failure to take a writedown at an earlier point in time amounted to fraud"). Plaintiffs still fail to plead anything to

indicate that Defendants were aware that they should have tested for and recorded an impairment earlier, yet fraudulently failed to do so.

In the original motion to dismiss, Defendants relied on two key cases that dismissed analogous claims for failure to record an earlier impairment brought by the same lawyers that represent Plaintiffs in this case. See City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Group Pub. Ltd. Co., 655 F.Supp.2d 262 (S.D.N.Y. 2009) ("Vodafone I"); In re Radian Sec. Litig., 612 F.Supp.2d 594 (E.D.Pa. 2009) ("Radian I"). This Court cited those two decisions in dismissing the Original Complaint. See Order at *11. Since that time, counsel has moved to amend their complaint in one and filed an amended complaint by right in the other, and in both cases, the amended pleadings have been rejected as still failing to plead with particularity when an earlier impairment was required to be recorded and why the failure to take an earlier write-down amounted to fraud. See City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Group Pub. Ltd. Co., 2010 WL 309009 (S.D.N.Y. Jan. 22, 2010) ("Vodafone II") (denying leave to amend); In re Radian Litig., 2010 WL 1767195 (E.D.Pa. Apr. 30, 2010) ("Radian II") (dismissing amended complaint with prejudice). Likewise here, the Proposed Complaint is still deficient, and the Motion should be denied.

With respect to the NAI Loans, Plaintiffs have added some detail about the loans but the new allegations do nothing to revive their claim. The Proposed Complaint still fails to allege that there was any duty to disclose the loans. Instead, Plaintiffs' new allegations continue to support the notion that the NAI Loans contained a covenant (not a pledge of CBS stock) that required a payment of money from some source (not necessarily from the sale of CBS stock) if the value of CBS and Viacom stock fell below a certain level. As this Court has already held, these allegations are insufficient to support a claim for securities fraud or supply a motive for

CBS to delay testing for an impairment.

Lastly, the Motion is futile for two additional independent reasons. First, Plaintiffs have failed to plead any false or misleading statements. Second, Plaintiffs still have not defeated the more logical competing inference that instead of committing fraud, CBS properly monitored its accounting and promptly tested for and recorded an impairment, but could not have predicted the economic upheaval that ensued in the third quarter of 2008. The United States Supreme Court's holding in <u>Tellabs, Inc.</u> v. <u>Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 314 (2007) requires Plaintiffs' fraud theory to be at least as compelling as the alternative non-fraud explanation, but their cobbled together scheme pales in comparison to the simple truth.

Accordingly, Plaintiffs' Proposed Complaint -- like their original one -- fails to meet the exacting standards of the PSLRA and leave to amend should therefore be denied.

## <u>ARGUMENT</u>

I. **PLAINTIFFS' MOTION FOR LEAVE TO AMEND SHOULD BE DENIED BECAUSE THE PROPOSED AMENDMENT WOULD BE FUTILE**

This Court recently denied leave to amend in another case where the plaintiff had not adequately pled securities fraud for an alleged delay by defendant in testing for and recording an impairment. <u>See Vodafone II</u> at *1. In doing so, the Court followed well-recognized Second Circuit law that "[l]eave to amend is especially inappropriate where, as here, plaintiffs' proposed amendments [are] merely recycled versions of claims which had already fallen victim to a motion to dismiss." <u>Bellikoff</u> v. <u>Eaton Vance Corp.</u>, 481 F.3d 110, 118 (2d Cir. 2007); <u>see also</u> <u>In re Pfizer, Inc. Derivative Sec. Litig.</u>, 307 Fed. Appx. 590, 595 (2d Cir. 2009) (affirming denial of leave to amend where "the proposed new allegations would be no more than variations on the allegations already adjudged to be inadequate by the court"). The Proposed Complaint suffers from the same deficiencies identified in the Order, and thus, the Motion should be denied.

**A.      Plaintiffs Have Not Pled That Defendants Were Obligated To Test For An Interim Impairment Before They Did**

1.      Market Capitalization Exceeding Book Value Does Not Necessitate An Interim Impairment Test Whether Designated As An Independent Test Or A "Significant Adverse Change In The Business Climate"

In the Original Complaint, the crux of Plaintiffs' claim was that an interim impairment was required simply because CBS' market capitalization had declined below the carrying value of its goodwill.  In the Motion, while Plaintiffs acknowledge that this Court rejected their bright-line market capitalization-book value test, they now argue that they have cured the identified deficiencies.  See Mot. at 3, 4.  But all Plaintiffs have done is argue that the decline in CBS' stock price functioned as a trigger -- "a significant adverse change in the business climate" -- necessitating an impairment, as opposed to as an independent test.  Id. at 4 (identifying the "significant adverse change" to be "where the market value of CBS stock radically exceeded the book value of its assets"); P. Compl. ¶ 84 ("[i]t was the continued decline in market capitalization that should have triggered an interim impairment test").

First, Plaintiffs fail to allege any "significant adverse change in the business climate" in the Proposed Complaint; in fact, this phrase does not even appear in the Proposed Complaint.  Thus, their purported reliance on this as a trigger in the Motion fails as a matter of law.  Second, arguing the market capitalization test as a "significant adverse change in the business climate" as opposed to a separate test is a distinction without a difference.  This Court has recognized specifically with respect to a "significant adverse change in the business climate" that "there may be multiple contributing factors relevant to whether it is 'more likely than not' that a reporting unit has lost fair value, and consequently whether an otherwise unscheduled impairment test is required under SFAS 142."  Order at *7.  Plaintiffs still fail to identify any trigger, or "multiple contributing factors" that required Defendants to earlier test for an interim impairment and thus,

fail to identify with particularity when CBS was required to test for an impairment.[3]

Indeed, if the need for an interim impairment test could be discerned simply by looking to the stock price of a company, there would be no need for annual testing. <u>See</u> Def. Mem. at 45. This Court recognized that Plaintiffs' theory was flawed because it "could make a company potentially liable for securities fraud based on an unexpected dip in its share price." Order at *9. Accordingly, Defendants pointed to guidance by SEC staff member Robert G. Fox III who recently stated: "the requirements of Statement 142 do not require that goodwill be marked-to-market (or <u>marked to market capitalization</u>)." Ex. 5 at 3 (emphasis added). Despite this, Plaintiffs wrongly state that "both the SEC and the Company itself acknowledge that the discrepancy between market and book values <u>necessitates</u> an interim impairment analysis." Mot. at 5 (emphasis added). This is simply not true. While Plaintiffs have now quoted various portions of Mr. Fox's speech in an attempt to create authority for their flawed theory, nothing in the speech makes any such acknowledgment (and certainly Defendants have made no such acknowledgement either).[4]

Instead, Fox's speech supports the notion that a decline in market capitalization is but one of many factors a company may use to consider whether interim testing is required. <u>See</u> Mot. at 4 (citing Fox: "[T]he decline are <u>likely</u> indicative factors the registrant should <u>consider</u> in their determination of fair value") (emphasis added). These remarks confirm what this Court has

---

[3] To the extent Plaintiffs are also arguing that the purported advertising revenue decline is a "significant adverse change in the business climate," this is not pled or even argued. But in any event, even if Plaintiffs had alleged or argued that advertising declines served as a trigger to test, they plainly do not, for all the same reasons set forth below at § I(B), as to why these declines did not obligate Defendants to record an impairment earlier.

[4] Likewise, Plaintiffs citation to outdated examples of impairment indicators from the "1999 Exposure Draft", P. Compl. ¶ 80, fails to provide authority for their flawed claim. These examples were "revised … to reflect [the Board's] decision that goodwill should be tested for impairment at the reporting unit level." Ex. 3 at B138.

already acknowledged with respect to SFAS 142: "This formulation necessarily involves judgment and discretion on the part of a company in deciding whether to undertake an intra-year impairment test. GAAP 'tolerate[s] a range of reasonable treatments, leaving the choice among alternatives to management.'" Order at *10 (quoting Thor Power Tools Co. v. Comm'r of Internal Revenue, 439 U.S. 522, 544 (1979)).[5]

It is not surprising that a company must exercise judgment in deciding whether to test for an interim impairment since calculating fair value is a process that necessarily involves looking at future market conditions. See Def. Mem. at 9. SFAS 142 explains that "the fair value measurement should reflect estimates and expectations that marketplace participants would use in their estimates of fair value whenever that information is available without undue cost and effort." Ex. 3 at B155. Indeed, a company's ability to exercise its judgment is particularly important when the matter necessarily involves technical accounting judgments rendered after complex valuation analyses based on projections of future performance in its reporting units. Def. Mem. at 18-19; see also Vodafone I, 655 F.Supp.2d at 270 (stating that the timing of a company's impairment is "contingent on the company's judgment about future events and its likely future income").

Nothing in the Proposed Complaint calls into question the judgment exercised by Defendants, and an attack on that judgment cannot be transmuted into fraud. Plaintiffs' excerpt from Fox's speech that "'I would also note that it would not be reasonable for a registrant to simply ignore recent declines in their stock price,'" Mot. at 4, does not call this judgment into

---

[5] Similarly, while Plaintiffs argue that CBS "acknowledged" the relevance of market capitalization, Plaintiffs concede that it was just "one of the factors that triggered its impairment testing." Mot. at 5 n.3. Regardless, this Court has determined that it "need not and do[es] not consider [Fox's speech] on this motion." See Order at *9 n.3. Defendants' arguments are not based on Fox's speech, but on language that appears on the face of SFAS 142 itself, as acknowledged by this Court. See id. at *7, *9.

question. Defendants did not ignore any declines. Rather, as Plaintiffs fail yet again to acknowledge, despite CBS' strong financial performance (which Plaintiffs do not dispute), at the end of the second quarter of 2008, CBS included a specific risk factor in its second quarter 10-Q in light of unfolding market events. Ex. 8 at 49. This disclosure specifically warned investors that "the Company continues to assess whether factors or indicators, such as the <u>continuation of existing market conditions</u>, become apparent that would require an interim test." <u>Id.</u> (emphasis added). Inclusion of this risk factor in CBS' public filing is indicative of a company that was properly monitoring the need for interim testing and keeping its investors informed. Unfortunately for the entire global economy and CBS, not only did the market conditions of the second quarter persist, they deteriorated in the third quarter to levels never before seen, and based upon these actual events, CBS reasonably believed for the first time that an interim impairment test had become necessary. <u>See</u> Def. Mem. at 26.

        2.      The New Allegations Are Fatally Imprecise In Alleging When CBS
                   <u>Should Have Tested For An Interim Impairment</u>

      Plaintiffs still fail to allege precisely when a "significant adverse change in the business climate" occurred which gave rise to the need to test for an interim impairment. While Plaintiffs now allege that the testing should have occurred in the first quarter of 2008, P. Compl. ¶¶ 58, 84, Plaintiffs still fail to allege when in this quarter such testing should have occurred or why it should have occurred in the first quarter. This Court has already carefully examined the first quarter and determined that in the Original Complaint, Plaintiffs had not pled any event "unique to the first quarter" which would necessitate an impairment. Order at *9. In the Proposed Complaint, Plaintiffs point to two potential triggers for an impairment: declines in market capitalization and declines in advertising spending. P. Compl. ¶ 84. As to the declining market capitalization, the Proposed Complaint suffers from the same deficiencies as the Original

Complaint. In particular, this Court held that despite the fact that there was already some alleged gap in the fourth quarter of 2007, there was no explanation as to "why, under their theory, such a gap would not have required impairment testing at some point during fiscal year 2007 rather than the first quarter of 2008." Order at *10. Nothing further is alleged here, and the Proposed Complaint is similarly deficient. Indeed the Proposed Complaint alleges that CBS' market capitalization had been declining since "at least the second quarter of 2007." P. Compl. ¶ 83.

As to the advertising revenue point, while there are additional allegations of declines in advertising spending, like the market capitalization point, it is also alleged to have occurred over time, beginning before the first quarter of 2008. Plaintiffs claim throughout the Proposed Complaint that advertising sales had been in a downward "trend" that began in 2007. Id. at ¶¶ 84, 96, 101. Plaintiffs' new confidential witness even alleges that one outdoor market began experiencing declines in 2005. Id. at ¶ 149. The Proposed Complaint fails to point to anything unique to the first quarter as opposed to the periods before or after. The closest attempt Plaintiffs make is their allegation that "signs that the industry would not quickly recover were already evident by the end of the first quarter 2008." Id. at ¶ 84. However, Plaintiffs fail to indicate what these signs were, that they were "evident" to anybody at CBS, or that anybody at CBS ignored them. As with the Original Complaint, Plaintiffs' claim here is another instance of "plaintiffs resting on their say-so." Order at *10.

### B.    Plaintiffs Have Not Pled That Defendants Were Obligated To Record An Impairment Charge At The End Of The First Quarter Of 2008

Plaintiffs now argue that the impairment should have been recorded at the end of the first quarter of 2008. Mot. at 5. Plaintiffs note the Court's concern that Plaintiffs had not pled any knowledge by Defendants or any event that put them on notice that earlier interim testing was required. See Id. But then Plaintiffs proceed to argue what this Court already rejected -- namely,

that declines in advertising throughout 2008 should have put Defendants on notice that an earlier impairment was required. Id. at 6. Plaintiffs' longer allegations of advertising declines, see P. Compl. ¶¶ 96-108, and the additional statements of one new confidential witness, see id. at ¶¶ 148-153, do not save the Proposed Complaint.[6]

1. Plaintiffs' New Allegations Of Advertising Spending Declines Do Not Establish That Defendants Were Obligated To Record An Earlier Impairment

There is no allegation that Defendants were aware of any fact showing that the fair value of a reporting unit had been reduced below its carrying amount requiring CBS to record an impairment earlier than it did. Plaintiffs originally pled that "a decline in advertising revenues occurred throughout 2008." Ex. 35 at ¶ 81 (emphasis in original). This Court concluded that this did not support a claim of inculpatory knowledge, holding that "a retrospective critique asserting that advertising revenues declined throughout the year does not amount to an allegation of knowledge on the part of the defendants that, during the first quarter of 2008, advertising revenues would slump throughout the year: lack of clairvoyance does not amount to fraud." Order at *9 (citing Acito v. IMCERA Group, Inc., 47 F.3d 47, 53 (2d Cir. 1995)). Plaintiffs now claim that they have addressed these concerns by providing "detailed business segment revenue numbers showing unequivocally that the significant fall-off in advertising sales mandated an interim impairment charge." Mot. at 6; P. Compl. ¶¶ 96-108. Plaintiffs' allegations do nothing

---

[6] Plaintiffs' new Class Period start date of April 29, 2008 coincides with CBS' announcement of its first quarter financial results. See P. Compl. ¶ 35. This latest shift is further evidence that Plaintiffs do not know when Defendants were required to record an impairment. Indeed, Plaintiffs allege, in other portions of the Proposed Complaint, dates other than April 29, 2008 on which they claim an impairment should have been recorded. For example, Plaintiffs allege that CBS was aware of "the necessity of an impairment charge, since January 2008" Id. at ¶ 52 (emphasis added), and should have recorded an impairment "in the first quarter of 2008." Id. at ¶ 58. Plaintiffs also allege nothing to clarify their arguments concerning the amount of the supposed impairment. While Plaintiffs did not originally specify an impairment "amount," they now allege that CBS should have recorded an impairment charge of $14.12 billion in the first quarter of 2008, but this is just the same amount that CBS announced on October 10, 2008. Id. at ¶¶ 58, 84. This allegation makes no sense given that Plaintiffs also allege that CBS' market capitalization and advertising revenue continued to decrease throughout 2008.

to respond to the flaws identified in this Court's Order.

a.    **The New Allegations Do Not Show Anything About The Reporting Units' Fair Value**

While Plaintiffs have added more detail and some charts, their allegations about advertising revenues still fail to show that it was more likely than not that an impairment was required at one or more of CBS' reporting units.  Plaintiffs now allege that "declines in spending on the Company's network television accelerated markedly from January through March 2008" and that "spending on radio and outdoor advertising … again reveal sharp declines in the first quarter of 2008."  Mot. at 6.  However, Plaintiffs do not explain why declines in advertising spending obligated CBS to record an interim impairment in the first quarter of 2008.  Indeed, to the extent there were advertising declines, Defendants reported them, and Plaintiffs do not and cannot allege to the contrary.  Moreover, advertising revenue is only one component of CBS' segments' income, and thus just one piece of one component of their fair value.

With respect to Television, the Proposed Complaint focuses on purported declines in Television network advertising.  P. Compl. ¶¶ 100-101.  However, advertising is not Television's only source of revenue and is certainly not the only determinant of fair value.  For example, while in the first quarter of 2008, Television reported a reduction in advertising revenues (15%), its overall revenues increased by 1% for the same prior-year period.  Ex. 7 at 30.  This included an 85% increase in license fees, and a 6% increase in affiliate revenues.  Id.  For the second quarter of 2008, Television's overall revenues increased by 2% from the same prior-year period, with a 35% increase in license fees and a 5% increase in affiliate revenues.  Ex. 8 at 35.  Also, for the second quarter, Television advertising sales decreased by only 6%.  Id.  The notion that Television's overall period-over-period revenues actually improved (2% over 1%) and that its advertising sales decreases had narrowed (from 15% to 6%), supports the conclusion that there

was no reason for Defendants to believe that it had become necessary to record an impairment in this business segment and completely undermines the claim that it was fraudulent to have failed to take an impairment earlier.

With respect to Outdoor, Plaintiffs allege that "Outdoor revenues dropp[ed] approximately 20% from <u>fourth quarter</u> 2007 to <u>first quarter</u> 2008." P. Compl. ¶ 107 (emphasis added). This allegation misleadingly reviews two consecutive, rather than comparable quarters. Had Plaintiffs instead compared first quarter 2007 revenues and first quarter 2008 revenues, they would have seen that first quarter revenues actually <u>increased</u> by 7% year-over-year. Ex. 7 at 32 (showing increased revenue from $462.3 million to $496.9 million). Similarly, the second quarter 2008 Outdoor revenues <u>increased</u> by 8% year-over-year. Ex. 8 at 37 (showing increased revenue from $554.2 million to $598.1 million).

Plaintiffs also provide a chart inaccurately titled as "De-Seasonalized Spending - Outdoor Market Segment." <u>Id.</u> at ¶ 106. However, Plaintiffs' chart has nothing to do with CBS - - it is about the outdoor advertising market "industry-wide." <u>Id.</u> But it fails to indicate whether it is a U.S. or international "industry-wide" market, or how if at all, the components of the industry data align with those of CBS. <u>Id.</u> Notably, CBS Outdoor operates in 100 North American markets, as well as additional markets in Europe, Asia and South America. Ex. 1 at I-12. Plaintiffs' radio chart likewise seems to be about some industry at large, not CBS, or the markets in which it operates. P. Compl. ¶ 102.[7] Absent data for the actual markets in which these segments operate, Plaintiffs' new allegations are irrelevant to determining the need for interim impairment testing or calculating the fair value of these reporting units.

---

[7] While the Radio reporting unit's revenues declined in the first and second quarters, <u>see</u> Ex. 8 at 36, in response to these declines, CBS initiated a plan to sell 50 of its 137 stations, which it announced during the second quarter conference call. Ex. 9 at 6 ("Divesting these 12 markets will add about two percentage points to radios revenue growth based on the most recent months"); Ex. 1 at I-8.

        b.      **The New Allegations Do Not Establish That Defendants Had Knowledge That CBS Was Required To Record An Impairment And Fraudulently Ignored It**

Even assuming <u>arguendo</u> that Plaintiffs are correct and Defendants should have tested and recorded an impairment earlier, absent more, this would not amount to fraud.  <u>See</u> <u>W. Va. Inv. Mgmt. Bd.</u> v. <u>Doral Fin. Corp.</u>, 344 Fed. Appx. 717, 720 (2d Cir. 2009) ("failure to comply with Generally Accepted Accounting Practices or other such irregularities are insufficient to establish recklessness"); Order at *9 (the Original Complaint "does not adequately allege that the failure to take an earlier impairment charge amounts to securities fraud").  Plaintiffs still fail to plead anything to indicate that Defendants were aware that they should have tested and recorded an impairment earlier and consciously refused to do so.  Plaintiffs' allegations of declines in advertising revenues read more like a technical accounting treatise than a securities fraud complaint.  This Court dismissed the Original Complaint because Plaintiffs had not alleged anything to explain why these purported accounting errors constituted fraud.  Order at *9-11. Among other things, the Court quoted <u>Radian I</u>, 612 F.Supp.2d at 615:  "[e]ven if an impairment of [the company's] investment did occur at some point earlier than [the company] ultimately stated, the plaintiffs do not allege facts to show that [the company's] decision not to report whatever impairment may have existed until July 2007 involved not merely simple, or even inexcusable negligence, but an extreme departure from the range of reasonable business treatments permitted under GAAP."  Order at *11.  The Proposed Complaint adds nothing to show why any purported accounting errors constituted fraud.  Determining whether advertising declines would persist and for how long they would continue, as this Court has recognized, "necessarily involves judgment and discretion on the part of a company."  <u>Id.</u> at *10.  Plaintiffs have pled nothing to indicate more than, at worst, Defendants' judgment was not correct, which is wholly insufficient to plead fraud.

Further, the fact that CBS' stock decline coincided with one of the worst stock markets in the history of the United States severely undermines the notion that Defendants committed fraud. See Radian II at *8 ("'when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases.'") (quoting First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 772 (2d Cir. 2004)). And any inference of inculpatory knowledge is belied by the fact CBS reported any declines that existed in advertising. See Radian II at *9 (rejecting plaintiffs' new allegations with respect to knowledge: "Radian itself acknowledged the market trend in its various conference calls, releases, and public filings").

Finally, Plaintiffs' allegations from the advertising industry articles, see P. Compl. ¶¶ 96-98, fail to provide any inculpatory knowledge. First, Plaintiffs do not plead that Defendants were even aware of these articles. Second, such allegations are not indicative of fraud. See Radian II at *8 ("new allegations and charts detailing the subprime market industry and C-BASS's general business model do not support a finding of conscious misbehavior and recklessness. Instead, they serve to establish that the market at large knew of the subprime industry's downward trend"). Lastly, these publications do not even support Plaintiffs claim; several of the publications predict increases in advertising spending. Id. at ¶ 97 ("industry sources predicted a 3.7% to 4.2% increase in overall advertising spending for 2008"); id. at ¶ 98 ("spending was up only 0.2%").[8] Indeed, portions of these articles that Plaintiffs did not cite predict even stronger results. The article Plaintiffs claim shows "[b]y early March 2008, some ad sales execs report

_____

[8] While the increases may have been a less robust increase than had been hoped for, simply alleging that growth predictions are more muted than what may have been hoped for does not allege that an earlier impairment was required. See Vodafone II at *4 (rejecting the allegation in the proposed complaint that "growth expectations for 3G phones were 'understood' by 'the market' to be 'unrealistically overstated,' prompting many industry experts to lower forecasts for expected growth" as too vague to allege what should have triggered the impairment).

that the first quarter of 2008 is soft" P. Compl. ¶ 98, also quoted an executive who said that the

"second quarter would be strong." Also, Plaintiffs' December 7, 2007 *Media Week* article

predicted that for 2008, "the four major TV networks will see ad spending grow by 5 percent."

> 2.    Statements from Plaintiffs' Latest Low-Level Witness Do Not Establish
>        That Defendants Knew They Had To Record An Earlier Impairment

The statements from new confidential witness 5 ("CW5"), like the statements of

Plaintiffs' other four CWs, fail to establish that (1) any event or circumstance occurred during

the Class Period that made it more likely than not that the fair value of any reporting unit had

dropped below its carrying value; (2) any Defendant had knowledge of such facts; or (3) the

failure to test for and record an impairment before October 10, 2008 was fraudulent. See Def.

Mem. at 37-44. CW5 was a low-level employee at a subgroup of one of CBS' reporting units.

CW5 worked as an Account Executive in CBS Outdoor and was responsible for selling billboard

advertising in just two of CBS Outdoor's 100 North American advertising markets. See P.

Compl. ¶¶ 148-49; Ex. 1 at I-12. There is no indication that CW5 had any accounting expertise.

CW5 claims that there were advertising slowdowns in these markets "as early as late 2005" and

that "the sluggish markets continued through 2008," P. Compl. at ¶ 149, and that his direct

supervisors told him "that upper management was not happy and would be monitoring his future

sales." Id. at ¶ 150. First, the notion that one local account executive's sales results could affect

the fair value of the Outdoor segment is absurd. Moreover, such a tangential link to "upper

management" does not plead that Defendants were aware of these declines. See Steinberg v.

Ericsson LM Tel. Co., 2008 WL 5170640, at *13 (S.D.N.Y. Dec. 10, 2008) (finding no scienter

where "all three of Plaintiff's confidential sources were mid-level managers in the United States

who claim no contacts or communications with Defendants"). And even assuming arguendo that

CW5's allegations are accurate and were communicated to Defendants, Plaintiffs also fail to

allege that Defendants learned of CW5's statements prior to disseminating the alleged

misleading statements.  See In re PXRE Group Ltd. Sec. Litig., 600 F.Supp.2d 510, 536

(S.D.N.Y.) (plaintiffs failed to allege that "the information was available at the same time that

Defendants made the challenged statements"), aff'd sub nom. 357 Fed. Appx. 393 (2d Cir.

2009).  Finally, the statements merely confirm that there was some softness in certain local U.S.

advertising markets, a fact CBS disclosed.[9]  Thus, as in Radian, CW5 fails to save the Proposed

Complaint.  See Radian I, 612 F.Supp.2d at 619 (finding that the "testimony [of confidential

witnesses] does not establish that the defendants knew or must have known that their statements

presented a danger of misleading buyers or sellers.  At best, this testimony only further

establishes the declining conditions at C-BASS and in the market generally"); see also Radian II

at *9 (rejecting the statements from new CWs: "First, their allegations all relate to C-BASS's

general financial state. Second, they do not contradict statements made by the defendants").[10]

### C. The Allegations Concerning The NAI Loans Do Not Cure The Deficiencies Identified In The Court's Order

#### 1. The Allegations Concerning The NAI Loans Do Not Support A Separate Claim of Securities Fraud

Separate from their claim that CBS delayed recording an impairment, Plaintiffs argue that

---

[9] While Defendants disclosed certain weaknesses in advertising, see Def. Mem. at 12, in fact, Outdoor reported increased revenues throughout the 2007 and 2008 – the period about which CW5's allegations relate.  The Outdoor reporting segment's revenues increased 4% overall for 2007, 7% for the first quarter of 2008 and 8% for the second quarter of 2008.  See id. at 11, 39.  These revenue increases also included significant increases in International markets (13% in 2007, 15% in first quarter of 2008, and 18% in the second quarter of 2008) -- where CW5 did not work, and with respect to which he apparently had no information.  Id.; Ex. 8 at 37.  Plaintiffs still do not challenge the veracity of these numbers.

[10] Other than these six new paragraphs with respect to CW5, Plaintiffs plead nothing new about either the insider stock sales or the other CWs to create a strong inference of scienter.  Thus, there is nothing new for this Court to consider with respect to either motive and opportunity or conscious misbehavior, and the Proposed Complaint should be dismissed for the same reasons articulated in Defendants' moving brief.  See Def. Mem. at 27-43.  Further, while Plaintiffs add certain allegations that the magnitude of the impairment announced on October 10, 2008 supports their claim that Defendants were required to record an impairment earlier, P. Compl. ¶¶ 88-92, like the Original Motion, these allegations improperly focus on enterprise level, and in any event, have been properly rejected by Radian I.  See Def. Mem. at 44-45.

CBS and Sumner Redstone independently committed securities fraud by not disclosing the NAI Loans. <u>See</u> Mot. at 7; P. Compl. ¶ 15. The Supreme Court and the Second Circuit have made clear that without an affirmative duty to speak, the securities laws do not impose a duty to disclose even a material fact. <u>See</u> <u>Basic Inc.</u> v. <u>Levinson</u>, 485 U.S. 224, 239 n.17 (1988) ("[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5"); <u>Glazer</u> v. <u>Formica Corp.</u>, 964 F.2d 149, 157 (2d Cir. 1992) ("a duty to speak must exist before the disclosure of material facts is required under Rule 10b-5") (citation omitted).

In the Original Complaint, Plaintiffs alleged no duty whatsoever necessitating disclosure of the NAI Loans. The Court held that while the Original Complaint "sets forth allegations as to the relationship between CBS's share price and the terms of Redstone's loan, [it] does not, on its face, allege that the loan's non-disclosure was a material omission constituting a stand-alone act of securities fraud." Order at *13. In the brief in opposition to Defendants' motion to dismiss, Plaintiffs raised two subsections of Item 403 of SEC Regulation S-K that they now plead in the Proposed Complaint. However, this Court already considered those rules and concluded that they did not apply because these rules only "require[] members of a company's management to disclose 'the amount of shares that are pledged as security'" and to disclose "a pledge of securities 'which may at a subsequent date result in a change in control of the registrant.'" <u>Id.</u> This Court then correctly concluded that the Original Complaint:

> does not allege that CBS shares were pledged as security by Redstone or could have resulted in a change of control. The Complaint simply asserts that the loan 'included a critical covenant requiring significant principal payments on the loans if the value of the CBS and Viacom stock under National Amusement's [sic] control fell below certain levels.' True, there is alleged to be a nexus between CBS's stock price and repayment of principal on the loan, but nowhere does the Complaint assert that Redstone's shares functioned as security on the loan.

Nothing in the Proposed Complaint alters this conclusion. Plaintiffs have still pled no

facts indicating that Redstone or any other Defendant had any duty to disclose the NAI Loans. Still absent from the Proposed Complaint is any allegation that the loans were a pledge or that they could result in a change in control of CBS.  Instead, Plaintiffs' new allegations, which consist primarily of public statements made by Mr. Redstone after the Class Period ended, continue to support the notion that the NAI Loans contained a covenant (not a pledge) that required a payment of money from some source (not necessarily from the sale of CBS stock) if the value of CBS and Viacom stock fell below a certain level.  See P. Compl. ¶ 111 (CBS earnings call:  "unforeseen and unprecedented market activity … caused a precipitous drop in the value of the overall market and of course in the value of CBS and Viacom shares.  This in turn triggered a covenant issue under NAI's debt agreement"); id. ¶ 112 (Viacom earnings call: "covenant agreements … were triggered by unforeseen and truly unprecedented market activity that caused a precipitous drop in the value of the overall market and in the market value of CBS and Viacom shares"); id. ¶ 113 (CNBC Interview:  "when the market collapsed, the stock … collapsed with it, and that was our problem, and we violated a covenant").

Plaintiffs have not pled anything to rebut the notion that NAI could have sold any of its assets -- including its 1500 movie screens -- or simply used cash to provide the necessary funds to repay the loans.  In Plaintiffs' own Proposed Complaint, they quote Mr. Redstone stating that NAI "is more than just its stock holdings.  Among its assets are a substantial and valuable theater operation built for the most part on land which we own….  And [NAI] includes more than 1500 screens in the United States, in Latin America, in the United Kingdom and Russia." Id. at ¶ 112. Plaintiffs also do not plead that the NAI Loans would result in a change of control.  All 17 million shares sold on October 10, 2008 by Redstone were non-voting shares.  Ex. 28.  Even after the sale, Redstone, through NAI, still held over 81% of the voting stock. Ex. 1, p. I-2.

Plaintiffs also now argue that the "[f]ailure to apprise investors of their existence is an actionable material omission." Mot. at 7. However, other than the inapplicable SEC regulations referenced above, the Proposed Complaint fails to allege any duty that would have required Redstone, or any other Defendant, to disclose the NAI Loans. As such, this claim fails to allege an independent claim of securities fraud.

       2.    <u>Plaintiffs Still Do Not Plead Motive With Respect To The NAI Loans</u>

       a.    **The NAI and Redstone Motive Allegations Are a Red Herring**

Plaintiffs allege that Defendants were motivated to conceal the NAI Loans during the Class Period. <u>See</u>, <u>e.g.</u>, P. Compl. ¶¶ 3, 14, 109. However, none of these allegations in any way supports the claim that CBS was required to record an impairment earlier than it did. Because CBS was not required to test for and take an impairment, any purported motive is irrelevant.

       b.    **Even If An Impairment Were Required, the NAI Loans Do Not Supply a Motive**

Plaintiffs also fail to establish that the existence of the NAI Loans served as a motive to commit fraud. The Second Circuit has made clear that motives that are generally possessed by most corporate directors and officers, including a desire to maintain high stock prices in order to increase executive compensation or to protect executive positions, do not suffice as a concrete and personal benefit. <u>ECA & Local 134 IBEW Joint Pension Trust</u> v. <u>JP Morgan Chase Co.</u>, 553 F.3d 187, 201 (2d Cir. 2009) (rejecting the desire to increase compensation as sufficient proof of motive); <u>Shields</u> v. <u>Citytrust Bancorp</u>, 25 F.3d 1124, 1130 (2d Cir. 1994) (rejecting the desire to protect executive positions as sufficient proof of motive). That Redstone, through NAI, may well have preferred not to make an early payment of a portion of the NAI Loans is exactly the type of motive the Second Circuit has held "can hardly be [a] basis on which an allegation of fraud is predicated." <u>Kalnit</u> v. <u>Eichler</u>, 264 F.3d 131, 140 (2d Cir. 2001) (citations omitted) (rejecting motives that can be imputed to all corporate officers and that are too speculative and

conclusory to support scienter).

Here, Plaintiffs have failed to plead more then general allegations of "informed economic self-interest." See Shields, 25 F.3d at 1130 ("[i]n looking for a sufficient allegation of motive, [the Second Circuit] assume[s] that the defendant is acting in his or her informed economic self-interest"). Absent from the Proposed Complaint is any allegation of an inability to repay or some negative consequence that would follow such repayment. In fact, there is no allegation that making the payment or selling the CBS shares resulted in any detriment to Redstone or NAI.

Further, the absence of any actionable motive by Redstone is supported by the fact that NAI's sale of 17 million shares occurred **after** CBS' October 10 announcement of revised downward guidance and a likely impairment. While Plaintiffs have repeatedly alleged in the Proposed Complaint that the stock sale and the announcement were on the same day, Plaintiffs do not allege -- because they cannot -- that the sale preceded the announcement. The announcement was made at 2:43 PM, see Ex. 26, and NAI's sales of 17 million CBS shares at $7.10 per share followed, and was posted more than two and half hours later, at 5:26 and 5:27 PM. See Ex. 27, Ex. 28.[11] Plaintiffs allege that CBS' stock opened on October 10 at $10.14. P. Compl. ¶ 10. At 2:42 PM, the minute before the announcement, the price of CBS' stock was $9.00. Ex. 27. Plaintiffs allege that the market close price was $8.10. P. Compl. ¶ 10. NAI's per share price of $7.10 was more than 21% below the price immediately preceding the announcement. It is plain that sales made after the announcement of the allegedly-concealed information do not demonstrate a motive for fraud.

**D.    Plaintiffs Have Again Failed To Plead Any False Or Misleading Statements**

Plaintiffs originally cited to CBS' public disclosures and conclusorily alleged that all the

_____

[11] The 17,000,000 shares sale was posted as broken into two pieces, with 9,999,999 shares recorded at 5:26 PM, and the second sale of 7,000,001 shares recorded at 5:27 PM. See Ex. 27.

statements were misleading in light of the purported failure to record an earlier impairment.  <u>See</u>

Ex. 35 at ¶¶ 35-56.  This Court found that this "conclusory assertion of fraud fails to satisfy the

particularity requirements of Rule 9(b) and the PSLRA."  Order at *10 (citing <u>Rombach</u> v.

<u>Chang</u>, 355 F.3d 164, 172 (2d Cir. 2004)).  In the Proposed Complaint, Plaintiffs again fail to

explain <u>why</u> the statements are misleading.  They merely block-quote CBS' financial disclosures

and summarily state that they were misleading.  <u>See</u> P. Compl. ¶¶ 35-50.  Plaintiffs are still

merely "resting on their say-so."  Order at *10.

Plaintiffs have also added a few new excerpts from CBS' earnings calls in which Mr.

Redstone expresses his optimism about CBS.  <u>See</u>, <u>e.g.</u>, <u>id.</u> at ¶ 38 ("I'm as enthusiastic, and I

mean it, as I have ever been about what the future holds for this great company").  These new

excerpts add nothing to Plaintiffs' claim.  This Court has already ruled that "lack of clairvoyance

does not amount to fraud," Order at *9, and "[t]he securities laws do not provide a cause of

action premised upon a hindsight review of faulty predictions as to business success."  <u>Id.</u> at *6.

Accordingly, Plaintiffs still fail to allege any actionable misstatements.

### E.    Plaintiffs Have Again Failed to Satisfy <u>Tellabs</u>

The Motion should be denied as futile for the independent reason that it fails under

<u>Tellabs, Inc.</u> v. <u>Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 314 (2007).  The Supreme Court held

that for a complaint to survive the exacting pleading requirements of the PSLRA, the "inference

of scienter must be more than merely plausible or reasonable -- it must be cogent and at least as

compelling as any opposing inference of nonfraudulent intent."  <u>Id.</u>  Plaintiffs' allegation that

CBS should have recorded an impairment by the end of the first quarter of 2008 remains, at

most, a disagreement with the accounting and business judgments that Defendants made with

respect to the long-term value of certain of CBS' intangible assets.  The allegations amount to a

non-cognizable assertion that in early 2008, CBS should have seen what no one else did -- the

severity of the coming economic disruption that roiled the economy and surprised regulators.

Accordingly, the Proposed Complaint, like its predecessor, fails to clear the hurdle erected by

Tellabs. Here, the opposing inference of non-fraudulent intent is overwhelming: As economic

conditions worsened in the third quarter of 2008, CBS appropriately determined that it was more

likely than not that an impairment had occurred, something that it plausibly did not believe in

prior quarters because of its continued strong results. This cogent and compelling explanation

overwhelms the Proposed Complaint's implausible scenario that beginning at the end of April

2008, Defendants knew that the intangible assets held in the Company's key business units were

materially impaired, and with fraudulent intent, lied repeatedly in public filings to help Mr.

Redstone and NAI delay repayment of a portion of loans taken by NAI.

## CONCLUSION

The Proposed Complaint is nothing more than a warmed-over version of the totally

deficient Original Complaint. Plaintiffs have utterly failed to cure any of the deficiencies

identified in this Court's Order dismissing the Original Complaint. In the Proposed Complaint,

Plaintiffs still fail to allege that CBS was required to test for or record an interim impairment in

any earlier period, and that failing to do so constituted fraud. Further, Plaintiffs still fail to allege

that there was any duty to disclose the NAI Loans. As such, Plaintiffs' motion for leave to

amend should be denied.

Dated:   May 24, 2010

By: _____
James W. Quinn
Greg A. Danilow
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
T: (212) 310-8000
*Counsel for Defendants*