UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
CITY OF OMAHA NEBRASKA CIVILIAN       :   Civil Action No.  08-CV-10816 (PKC)
EMPLOYEES' RETIREMENT SYSTEM and      :
CITY OF OMAHA POLICE AND FIRST        :   **REPLY MEMORANDUM IN FURTHER**
RETIREMENT SYSTEM, Individually and On :   **SUPPORT OF LEAD PLAINTIFFS'**
Behalf Of All Others Similarly Situated,   :   **MOTION FOR LEAVE TO AMEND**
                                      :
                 Plaintiffs,          :
                                      :
         vs.                          :
                                      :
CBS CORPORATION, SUMNER               :
REDSTONE, LESLIE MOONVES, FREDRIC     :
G. REYNOLDS and SUSAN C. GORDON,      :
                                      :
                 Defendants.          :
------------------------------------------------------- x

**TABLE OF CONTENTS**

I.  The Obvious Motive and Opportunity Possessed by Defendants Redstone and CBS, As Alleged in the [Proposed] Second Amended Complaint, Demonstrate that Amendment Would Not be "Futile" .................. 1

II. The Cases of *Sterling Heights* and *Radian*, Relied Upon by Defendants, Are Completely Distinguishable ............................................................. 3

III. The Allegations in the [Proposed] Second Amended Complaint Adequately Plead That Defendants, at the Very Least, Acted Recklessly ............................ 5

    A.    Lead Plaintiffs Have Identified Two Independent Triggering Events That Required Defendants to Perform an Interim Impairment Test in the First Quarter of 2008 .................................................. 5

    B.    Lead Plaintiffs Have Adequately Pleaded That Defendants Were Required to Record an Impairment Charge in the First Quarter of 2008 ................. 8

IV. The Allegations in the [Proposed] Second Amended Complaint Sufficiently Plead That Defendants Made False and Misleading Statements ......................... 10

CONCLUSION ....................................................................... 10

## TABLE OF AUTHORITIES

**Cases**                                                                                              **Page No.**

*Campo v. Sears Holdings Corp.*,
    No. 09-3589-cv, 2010 U.S. App. LEXIS 7043
    (2d Cir. Apr. 6, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*City of Sterling Heights Police & Fire Retirement Sys.*,
    No. 07 Civ. 9921 (PKC), 2010 U.S. Dist. LEXIS 6269
    (S.D.N.Y. Jan. 22, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*In re Centerline Holding Co. Sec. Litig.*,
    No. 09-3744-cv, 2010 U.S. App. LEXIS 11705
    (2d Cir. June 9, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*In re Radian Sec. Litig.*,
    Civil Action No. 07-3375, 2010 U.S. Dist. LEXIS 42849
    (E.D. Pa. Apr. 30, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

*Iroquis Indus., Inc. v. Syracuse China Corp.*,
    417 F.2d 963 (2d Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8 n.5

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) . . . . . . . . . . . . . . . 1, 4 n.1, 6

*Turkish v. Kasentz*,
    27 F.3d 23 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**Other Authority**                                                                                    **Page No.**

15 U.S.C. § 78j(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

15 U.S.C. § 78u-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Lead Plaintiffs, the City of Omaha, Nebraska Civilian Employees Retirement System and the City of Omaha Police and Fire Retirement System (the "Omaha Funds" or "Lead Plaintiffs"), have accepted this Court's invitation to propose a revised pleading addressing the issues underlying the dismissal of their initial Amended Complaint (the "Original Complaint"). As the Court knows well, it was a finding that Lead Plaintiffs had failed in the Original Complaint to adequately allege scienter under the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4, that led to the entry of the Memorandum and Order granting Defendants' Motion to Dismiss the [Original] Complaint. Naturally, Lead Plaintiffs have taken heed of this guidance, and they have attached to their Motion for Leave to Amend a [Proposed] Second Amended Complaint that remedies all perceived deficiencies by pleading that Defendants also possessed an actionable state of mind when they otherwise violated § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b). Defendants disagree, of course, arguing that the requested amendment would be "futile" based on a confused and confusing theory that the new complaint still falls short of applicable scienter requirements. For the reasons stated in this Reply and Lead Plaintiffs' Memorandum of Law in Support of [Their] Motion for Leave to Amend, Defendants' opposition should be rejected and the Second Amended Complaint accepted for filing.

I.  The Obvious Motive and Opportunity Possessed by Defendants Redstone and CBS, As Alleged in the [Proposed] Second Amended Complaint, Demonstrate that Amendedment Would Not be "Futile"

As a preliminary matter, when making out a "strong inference" of scienter that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324, 127 S. Ct. 2499, 2510, 168 L. Ed. 2d 179, 194 (2007), the United States Court of Appeals for the Second Circuit (the "Second Circuit") has

remained steadfast that it is enough to show "that defendants had the motive and opportunity to commit fraud," *In re Centerline Holding Co. Sec. Litig.*, No. 09-3744-cv, 2010 U.S. App. LEXIS 11705, at *4 (2d Cir. June 9, 2010) (summary order).  Because any fair reading of the [Proposed] Second Amended Complaint leaves no doubt that Defendant Sumner Redstone ("Redstone") had both the motive and opportunity to spearhead the fraudulent scheme at CBS Corporation ("CBS" or the "Company") that has now been laid bare, Lead Plaintiffs have – for that reason alone – raised a strong inference of scienter in keeping with controlling authorities.  This Court need go no further when evaluating the pending Motion for Leave to Amend.

Insofar as motive is concerned, this factor has in mind "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Campo v. Sears Holdings Corp.*, No. 09-3589-cv, 2010 U.S. App. LEXIS 7043, at *6 (2d Cir. Apr. 6, 2010) (summary order).  It stretches credulity to deny – as Defendants do – that an attempt to avoid hundreds of millions of dollars in principal payments on loans is a motive to perpetrate fraud.  Thankfully, though, in this instance common sense is aided by a Second Circuit decision directly on point.  The appellate court could have been no clearer in *Turkish v. Kasentz*, 27 F.3d 23, 28 (2d Cir. 1994), when it stressed that "a desire to avoid repaying loans" constitutes "a motive for committing . . . fraud."  Succinctly stated, Lead Plaintiffs have acceptably pleaded motive when it comes to Defendant Redstone.

Turning to opportunity, it is a foregone conclusion that the Chairman of the Board of Directors at CBS, who also beneficially owned more that 80% of the Company's voting stock, had the opportunity to interfere with timely impairment testing and to fraudulently conceal from investors the Company's true financial condition.  As such, it is evident that the [Proposed] Second Amended

Complaint establishes Defendant Redstone's motive and opportunity to commit fraud, thus raising a strong inference of scienter as to both him and CBS. (*See, e.g.,* Second Am. Compl. ¶¶ 109-114.) This reality is, in itself, sufficient to dispel Defendants' cries of futility and to justify the filing of the Second Amended Complaint. For good measure, however, Lead Plaintiffs also address other points raised in Defendants' Opposition.

II.   The Cases of *Sterling Heights* and *Radian*, Relied Upon by Defendants, Are Completely Distinguishable

It is not particularly surprising, certainly, that Defendants again pin much significance on the cases of *City of Sterling Heights Police & Fire Retirement Sys. v. Vodafone Group Pub. Ltd. Co.*, No. 07 Civ. 9921 (PKC), 2010 U.S. Dist. LEXIS 6269 (S.D.N.Y. Jan. 22, 2010) (Castel, J.), and *In re: Radian Sec. Litig.*, Civil Action No. 07-3375, 2010 U.S. Dist. LEXIS 42849 (E.D. Pa. Apr. 30, 2010) – namely, the recent rejection of an amended complaint in each of those proceedings. As was so at earlier stages of the various lawsuits, this matter is easily distinguished from both *Sterling Heights* and *Radian*. To be sure, this Court has already recognized that the Original Complaint featured allegations "more detailed than those of *City of Sterling Heights*." (Mem. & Order of Mar. 26, 2010 at 20.) So, too, is the [Proposed] Second Amended Complaint superior to its counterparts from *Sterling Heights* and *Radian*.

To begin with, there is no indication that either *Sterling Heights* or *Radian* boasted allegations of motive and opportunity rivaling those found in the [Proposed] Second Amended Complaint, and that singular distinction is dispositive. Beyond that, however, the most hasty comparison of the [Proposed] Second Amended Complaint with its forerunner reveals that the amended pleading here benefits from paragraphs directly responsive to this Court's critique of the

Original Complaint. Unlike *Sterling Heights* – where the aggrieved investors could still do no better than claim that the defendant corporation should have recognized an impairment "at some unidentified point prior to the beginning of the Class Period," *Sterling Heights*, 2010 U.S. Dist. LEXIS 6269, at *10-11 (quotation omitted), in a non-specific amount that might have been "tens of billions of dollars," *id.* at *12 (quotation omitted) – the Omaha Funds specifically identify "a sufficiently discernable point in time when an impairment charge should have been taken" (Mem. & Order of Mar. 16, 2010 at 19-20): "[B]y the end of the first quarter 2008" (*E.g.*, [Proposed] Second Am. Compl. ¶ 108)). In like fashion, Lead Plaintiffs now pinpoint an exact amount for the impairment CBS should have taken at that time: $14.12 billion.[1] (*See id.* ¶ 84.) This level of specificity differentiates this action from *Sterling Heights* and *Radian*, creating a wholly different record justifying a directly contrary result. *Cf. also Radian*, 2010 U.S. Dist. LEXIS 42849, at *37 ("[P]laintiffs fail to allege with particularity how and when the defendants knew that [a certain asset]

---

[1] Predictably, Defendants cannot help but quibble with this figure, noting that it corresponds with the amount that CBS announced when it finally recognized an impairment on October 10, 2008. (Defs. Mem. Law Opp'n Mot. Leave Amend 11 n.6.) As Defendants view things, then, this sum makes "no sense" because conditions continued to deteriorate throughout the year. Although quarrels like this are better left for discovery, Lead Plaintiffs for present purposes would only point out that the impairment test is a forward-looking assessment that takes into account expectations about future performance. The [Proposed] Second Amended Complaint makes clear that the dramatic downturn in business at CBS started at the end of 2007 and accelerated in early 2008. Accordingly, the fact that performance continued to decline only confirmed what CBS management already knew by the time the Company filed its 10-Q for the first quarter of 2008. With this much understood, the evenness of the amounts makes perfect sense.

More fundamentally, though, with this squabble – as with Defendants' analogous issues with the time Lead Plaintiffs have identified as appropriate for recognizing the impairment (*see id.*) – Defendants are currently bound to "accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 2509, 168 L. Ed. 2d 179, 192 (2007).

was impaired.").

III.   The Allegations in the [Proposed] Second Amended Complaint Adequately Plead that <u>Defendants, at the Very Least, Acted Recklessly</u>

Again, controlling authorities counsel that this Court need not look any further than Defendants' motive and opportunity when passing upon the propriety of amendment here. Still, in countering Defendants' charges of "futility," it bears emphasis that Lead Plaintiffs have also alleged with particularity that Defendants' actions, or rather inaction, were reckless. Under the facts alleged by Lead Plaintiffs in the proposed Amended Complaint, the goodwill of CBS was impaired at the beginning of 2008, requiring Defendants to perform an interim impairment test by, at the latest, the end of the first quarter.[2]

   A.   Lead Plaintiffs Have Identified Two Independent Triggering Events That Required <u>Defendants to Perform an Interim Impairment Test in the First Quarter of 2008</u>

Defendants take great pains to blur the lines between the two triggering events identified in Lead Plaintiffs' [Proposed] Second Amended Complaint. Nonetheless, contrary to the stupefying approach heralded by Defendants, each of the alleged circumstances independently, and certainly conjunctively, required Defendants to perform an interim impairment test in the first quarter of 2008. The first event giving impetus to an impairment test is the pattern of decline in CBS's market

---

[2] Defendants contend that Lead Plaintiffs' allegations regarding the time the interim impairment test should have been performed are somehow imprecise. This assertion is somewhat perplexing as Defendants concede that the beginning of the Class Period coincides with CBS's fiscal reporting periods. (*See* Defs.' Opp'n 11 n.6.) Thus, in direct contrast to Defendants' characterization, the proposed Amended Complaint plainly establishes that the circumstances that evolved during the first quarter of 2008 required Defendants to perform an interim impairment test by, at the latest, the time they were reporting their financials to the marketplace, *i.e.* the end of the first quarter of 2008.

capitalization.[3]  In this regard, Lead Plaintiffs' revised pleading states that while the Company's market value had begun declining by at least the second quarter of 2007, there was an acceleration of this decline, amounting to approximately $3.5 billion, in the first quarter of 2008.  (*See* Second Am. Compl. ¶ 83.)  This accelerated decline had the effect of *doubling* the gap between CBS's book value and its market capitalization during the first quarter of 2008.  (*Id.* ¶ 77.)  Thus, in the first quarter of 2008 it was evident that management's hopeful predictions that the industry would be able to recover from the downward trends occurring in 2007 were no longer reasonable, and that industry declines were not temporary.  (*See id.* ¶¶ 84, 89, 96.)  Accepting the truth of these facts, as this Court must, *see Tellabs*, 551 U.S. at 322, 127 S. Ct. at 2509, 168 L. Ed. 2d at 192, the proposed Amended Complaint adequately alleges that the triggering event requiring an interim impairment test was based on circumstances known to the Defendants in the first quarter of 2008.

Indeed, on this point, Defendants essentially argue that the accelerated decline of *half a billion dollars in one quarter* did not amount to enough of a "significant adverse change in business climate" to require an impairment test.  (*See* Defs. Opp'n 6.)  As SEC staff member Robert G. Fox III has made clear, however, "it would **not** be reasonable for a registrant to simply ignore recent declines in their stock price, as the decline[s] are likely indicative of factors the registrant should consider in their determination of fair value, such as a more than temporary repricing of the risk

---

[3] Additionally, Defendants incorrectly assert that "the crux of Plaintiffs' claim was that an interim impairment was required simply because CBS' market capitalization had declined below the carrying value of its goodwill." (Defs.' Opp'n 6.) In truth, the claim that impairment testing should have been performed in the first quarter of 2008 properly compares CBS's market capitalization to the book value of the *entire Company*, not merely the book value of the Company's goodwill. Additionally, as discussed in the text, this assertion does not rest on the decline of market capitalization alone, but also the current and anticipated decline of advertising revenue.

inherent in any company's equity that results in higher required rate of return or a decline in the market's estimated future cash flows of the company." ([Proposed] Second Am. Compl. ¶ 70 (emphasis added).) Thus, Mr. Fox's statements support Lead Plaintiffs' allegations that the accelerated decline in market capitalization was enough to make Defendants aware that it was more likely than not that industry numbers were not going to rebound from the downward trend that had commenced in 2007.[4]

Notwithstanding, Defendants contend that in the current circumstances it was appropriate for them to turn a blind eye to this overwhelming evidence because it represents only one of many factors that a Company may consider. (Defs.' Opp'n 7.) First, Defendants' argument misses the mark as this single event was, in fact, alarming enough to warrant the performance of an interim impairment test. (*See* [Proposed] Second Am. Compl. ¶ 80.) More to the point, this is not the only triggering event identified by Lead Plaintiffs. Rather, Lead Plaintiffs have identified a second triggering event which independently, and definitely when coupled with the above circumstances, required Defendants to perform an interim impairment test in the first quarter of 2008. To be more specific, the decline in actual advertising revenue in the first quarter of 2008 also required Defendants to perform an impairment test by the end of that reporting period. To put it frankly, the significant decline in advertising revenue for the Company's network television, radio, and outdoor

---

[4] Indeed, the 1999 Exposure Draft makes clear that one example of "events or circumstances that indicate that the carrying amount of goodwill may not be recoverable" is when "the carrying amount of the net assets of the reporting enterprise is more than its market capitalization at the balance sheet date." (*See* [Proposed] Second Am. Compl. ¶ 80.) Defendants' dismissal of this guidance as outdated is unavailing. As the new pleading explains, SFAS 142 provides reference to earlier exposure drafts, such as the one cited by Lead Plaintiffs, to further explain the FASB's basis for conclusions. *Id.*

7

segments in the first quarter of 2008 necessitated an interim impairment test. ([Proposed] Second Am. Compl. ¶¶ 99-108.) For example, advertising revenues for the outdoor segment alone dropped 20% from the fourth quarter 2007 to the first quarter 2008 (*id.* ¶ 107), while advertising revenue from the radio segment dropped 13% from late 2007 to the first quarter 2008 (*id.* ¶ 104), a notable difference from the 3.7% to 4.2% *increase* in advertising spending projected in December 2007 (*id.* ¶ 97). This significant decline, which was known to CBS executives before the financial results for the first quarter 2008 were disclosed to the public, required CBS to perform an interim impairment test in the first quarter of 2008.[5]

        B.    Lead Plaintiffs Have Adequately Pleaded That Defendants Were Required to Record an Impairment Charge in the First Quarter of 2008

On the one hand, Defendants acknowledge that Lead Plaintiffs have alleged that Defendants were required to record an impairment charge of $14.12 billion in the first quarter of 2008. (Defs.' Opp'n 10-11.) On the other hand, Defendants argue that this allegation is deficient because it is the same amount that CBS eventually wrote off in the third quarter of 2008. (*Id.* 11 n.6.) To reiterate, Defendants fail to recognize that the impairment test is a forward-looking test that takes into account

---

[5]Likewise, Defendants' statement that "Nothing in the Proposed Complaint calls into question the judgment exercised by Defendants" is simply false. Rather, a proper reading of the [Proposed] Second Amended Complaint demonstrates that Lead Plaintiffs directly challenge Defendants' actions in ignoring specific events that required them to perform an impairment test in the first quarter of 2008. In this same vein, it is incorrect when Defendants now contend that CBS adequately forewarned investors by disclosing in the second quarter of 2008 that "the Company continues to assess whether factors or indicators, such as the continuation of existing market conditions, become apparent that would require an interim test." Indeed, this statement is a half-truth at best as it omits any mention of specific, known facts signaling that the Company's goodwill was impaired and requiring the Company to perform an interim impairment test in the first quarter of 2008. *See Iroquis Indus., Inc. v. Syracuse China Corp.*, 417 F.2d 963, 966-67 (2d Cir. 1969) (noting that Rule 10b-5 "makes it unlawful to employ fraud (including half-truths)").

expectations about future performance. As such, the [Proposed] Second Amended Complaint alleges that, based on the pattern of decline, which accelerated in early 2008, the Company was required to perform an interim impairment test in the first quarter of 2008 that would consider the expected continued decline in business projections. Accordingly, the fact that business conditions did continue to deteriorate throughout 2008 simply confirms that Defendants were required to record an impairment charge of $14.12 billion in the first quarter of 2008.[6]

In opposition to Lead Plaintiffs' allegations in this regard, Defendants argue that information in the [Proposed] Second Amended Complaint regarding industry and reporting unit data is in no way indicative of CBS's own expectations and performance. Defendants' argument is nothing more than a smokescreen. In point of fact, CBS itself cited expected further declines in advertising spending as one impetus for the third quarter 2008 interim impairment testing. Thus, this revenue stream is of particular importance to CBS in evaluating the value of goodwill and other intangible assets. In fact, according to CBS's 2008 Form 10-K, advertising sales accounted for approximately 66% and 72% of the Company's total revenues in fiscal 2008 and 2007, respectively. The significant year over year drop in advertising sales revenue confirms what Defendants knew in the first quarter of 2008. Moreover, while industry sources were predicting modest increases in advertising spending in 2008, the articles cited in the [Proposed] Second Amended Complaint make it clear that the forecasts were a disappointing reflection of poor market conditions, and the small projected

---

[6]To further explain, the Omaha Funds allege that the interim impairment test that the Company should have performed in the first quarter of 2008 is the same test that was actually performed in the third quarter of 2008, which, in general terms, discounts estimated future cash flows. Thus, had Defendants timely performed the test in the first quarter of 2008, they would have been required to write-off $14.12 billion in the first quarter of 2008.

increases were solely attributable to the Olympics, which were not broadcast by CBS, and political campaigns. (*See* [Proposed] Second Am. Compl. ¶¶ 96-98.)

Similarly, CBS's quarter over quarter drop in outdoor revenue of 20% in the first quarter of 2008 is indicative of what CBS might reasonably have expected from the future performance of that reporting segment. Thus, CBS's outlook for future performance should have dimmed dramatically as a result of the industry predictions and its own experience throughout first quarter of 2008. These facts, considered with expectations of the other major reporting segments, should have prompted CBS to perform an interim impairment test and to record an impairment charge in the first quarter of 2008.

IV. The Allegations in the [Proposed] Second Amended Complaint Sufficiently Plead that <u>Defendants Made False and Misleading Statements</u>

Lastly, Defendants assert that Lead Plaintiffs' amendment should not be allowed because the [Proposed] Second Amended Complaint does not sufficiently allege that Defendants made a single false or misleading statement. Defendants' assertion is completely off the mark. A proper reading of the [Proposed] Second Amended Complaint evidences that the allegations aver that the identified statements in paragraphs 35-41 and 43-49 were false and misleading because the Company's: (i) reported goodwill and intangible assets, (ii) reported equity, (iii) net income, and (iv) deferred income and taxes were overstated during the Class Period. (*See* [Proposed] Second Am. Compl. ¶¶ 42, 50.)

## **CONCLUSION**

For the reasons stated in Lead Plaintiffs' briefing before this Court, their Motion for Leave to Amend should be granted.

DATED: June 14, 2010

Respectfully submitted,

**ROBBINS GELLER RUDMAN & DOWD LLP**
SAMUEL H. RUDMAN
DAVID A. ROSENFELD

    /s/ David Rosenfeld
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

*Liaison Counsel for Plaintiffs*

**CARNEY WILLIAMS BATES BOZEMAN &
    PULLIAM, PLLC**
Allen Carney
Curtis L. Bowman
Marcus N. Bozeman
Tiffany Oldham
11311 Arcade Drive, Suite 200
Little Rock, AR  72212
Telephone: (501) 312-8500
Facsimile: (501) 312-8505

*Lead Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

      I, David Rosenfeld, hereby certify that on June 14, 2010, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system and the following counsel were served via the ECF pursuant to the local rules on electronic filing:

| | |
|---|---|
| James W. Quinn | Samuel H. Rudman |
| Greg A. Danilow | David A. Rosenfeld |
| Yedudah L. Buchweitz | Mario Alba, Jr. |
| Weil, Gotshal & Manges, LLP | Robbins Geller Rudman & Dowd LLP |
| 767 Fifth Avenue | 58 South Service Road, Suite 200 |
| New York, NY  10153-0119 | Melville, NY  11747 |

J. Allen Carney
Curtis L. Bowman
Marcus N. Bozeman
Carney Williams Bates
   Bozeman & Pulliam, PLLC
11311 Arcade Drive, Suite 200
Little Rock, Arkansas  72212